**PRETERM CLEVELAND, et al., Appellees,**

**v.**

**VOINOVICH, Governor, et al., Appellants.**

[Cite as *Preterm Cleveland v. Voinovich* (1993), 89 Ohio App.3d 684.]

Court of Appeals of Ohio,
Franklin County.

No. 92AP–791.

Decided July 27, 1993.

686

*Kevin Francis O'Neill,* for appellees.

*Lee I. Fisher,* Attorney General, *Kathleen McDonald O'Malley, Andrew I. Sutter* and *Andrew S. Bergman,* Assistant Attorneys General, for appellants.

*Julia A. Davis,* for *amici curiae,* League of Women Voters of Ohio, Council of Ohio YWCAs and Women Lawyers of Franklin County.

*Cathy J. Levine,* for *amicus curiae,* NARAL Ohio Education Foundation.

*Marcy Wilder, Dawn Johnson* and *Lois Eisner Murphey,* for *amicus curiae,* National Abortion Rights Action League.

*Young & Alexander Co., L.P.A.,* and *A. Mark Segreti, Jr.; Geoffrey Walker; Gregory Noble,* for *amicus curiae,* Dayton Physicians for Life.

*John G. Farnan; Clarke Forsythe, Paul Benjamin Linton* and *Kevin J. Todd; Robert A. Destro,* for *amicus curiae,* Ohio's Lawyers for Life.

*David M. Smolin; Daniel G. LaPorte; Nancy G. Lovin; Robert R. Melnick,* for *amici curiae,* Ohio Right to Life Society, Inc., Women Exploited by Abortion of Ohio, and Rutherford Institute of Ohio.

*Patrick J. Perotti; Ronald Suster; Brames, Bopp, Able & Oldham, James Bopp, Jr.* and *Richard E. Coleson; Edward F. Kasputis,* for *amici curiae,* Rep. Jerome Luebbers, Rep. Ronald Suster, Rep. Jim Buchy and Rep. Edward Kasputis.

---

WHITESIDE, Judge.

Defendants, George Voinovich, in his official capacity as Governor of the state of Ohio, Lee Fisher, in his official capacity as Attorney General of the state of Ohio, and Edward G. Kilroy, M.D., in his official capacity as Director of the Ohio Department of Health, appeal from a judgment of the Franklin County Court of Common Pleas declaring R.C. 2317.56(A) through (H) and R.C. 4731.22(B)(23) as amended (collectively "H.B. No. 108") to be unconstitutional on their face under both the Ohio and the United States Constitutions and granting a permanent injunction against the defendants and state employees and agents from enforcing, implementing or executing the statutory provisions so found to be unconstitutional.

Plaintiffs, Preterm Cleveland, Lee Rubinstein, M.D., Barbara Miller and Susan Lipkin, brought this action seeking the declaratory and injunctive relief granted by the trial court. Preterm Cleveland ("Preterm") is a nonprofit corporation located in Cleveland, Ohio, and, *inter alia,* provides abortion services, the complaint alleging that seven thousand five hundred abortions were performed at the Preterm facility in 1990. Plaintiff Lee Rubinstein, M.D., a physician licensed to practice medicine in the state of Ohio and an obstetrician/gynecologist providing abortion services since 1978, is employed as a private contractor at Preterm and also practices at other hospitals. Plaintiff Barbara Miller is a medical counselor at Preterm. Plaintiff Susan Lipkin is the counseling director at Preterm. No issue has been raised as to the standing of the plaintiffs to maintain this action.

In support of their appeal, defendants raise two assignments of error, as follows:

"I. The trial court erred when it declared R.C. 2317.56(A)–(H) and 4731.-22(B)(23) facially unconstitutional under the United States Constitution. (Docket Entry No. 43, *Preterm Cleveland, et al., v. Voinovich, et al.* (Franklin C.P. May 27, 1992) Case No. 92CVH01–528, unreported).

"II. The trial court erred when it declared R.C. 2317.56(A)–(H) and 4731.-22(B)(23) facially unconstitutional under the Ohio Constitution. (Docket Entry No. 43, *Preterm Cleveland, et al., v. Voinovich, et al.* (Franklin C.P. May 27, 1992), Case No. 92CVH01–518, unreported)."

Since the trial court decision and judgment, during the pendency of the appeal in this court, the United States Supreme Court decided the case of *Planned Parenthood of Southeastern Pennsylvania v. Casey* (1992), 505 U.S. ——, 112 S.Ct. 2791, 120 L.Ed.2d 674 (*"Planned Parenthood"*),[1] finding constitutional a Pennsylvania statute very similar to the Ohio statute under attack herein. As a result of *Planned Parenthood*, plaintiffs concede that the defendants' first assignment of error is well taken with respect to plaintiffs' liberty, privacy and speech claims under the United States Constitution but contend that plaintiffs' claim remains viable under the United States Constitution to the extent it is predicated upon the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution. Accordingly, we will first consider the primary issue herein, whether the challenged statutes violate any provision of the Ohio Constitution. The trial court found that the challenged statutes violate Section 1, Section 2, Section 7 and Section 11, Article I, Ohio Constitution.

Much of the brief of plaintiffs as appellees herein is devoted to arguing the obvious, namely, that the Ohio Constitution can confer greater rights upon individuals (or greater restrictions upon the legislative power of the General Assembly) than are imposed by the United States Constitution. Plaintiffs suggest that the Ohio Supreme Court recognized this principle for the first time in *State v. Brown* (1992), 63 Ohio St.3d 349, 588 N.E.2d 113. As defendants point out, this is not a novel proposition. The *amicus* brief filed in support of plaintiffs by the League of Ohio Voters of Ohio et al. also points out that the Supreme Court has long recognized the obvious conclusion that the Ohio Constitution can confer greater rights and cites the 1941 decision in *Direct Plumbing Supply Co. v. Dayton* (1941), 138 Ohio St. 540, 21 O.O. 422, 38 N.E.2d 70. To the same effect, see, for example, *State v. Smith* (1931), 123 Ohio St. 237, 174 N.E. 768; *State v. Mapp* (1960), 170 Ohio St. 427, 11 O.O.2d 169, 166 N.E.2d 387;[2] *State ex rel. The Repository v. Unger* (1986), 28 Ohio St.3d 418, 28 OBR 472, 504 N.E.2d

---

1. Although there is no definitive rule as to the appropriate method of short reference to a case, we use the commonly accepted form of using the name of the first party named, unless it is the state or the United States, but have shortened it to *"Planned Parenthood."*

2. *Mapp* was reversed in *Mapp v. Ohio* (1961), 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081, finding the exclusionary rule to apply to state action seizing evidence in violation of the Fourth Amendment and overruling the contrary holding in *Wolfe v. Colorado* (1949), 338 U.S. 25, 69 S.Ct. 1359, 93 L.Ed. 1782, relied upon by the Ohio Supreme Court in *Mapp*.

37; and *Bd. of Edn. v. Walter* (1979), 58 Ohio St.2d 368, 12 O.O.3d 327, 390 N.E.2d 813.

■ However, there has been little occasion for the Ohio courts to apply Ohio constitutional provisions, rather than parallel federal constitutional provisions, since in most instances the federal constitution has been construed to impose either the same restrictions or greater restrictions upon state action than does the Ohio Constitution. It is only in those instances where the Ohio Constitution imposes greater restrictions upon state action than are imposed upon the states by the federal constitution that it is necessary to examine the Ohio Constitution and to apply its provisions even though the federal constitution may not restrict the state action involved.

■ Looking at the constitutional provisions from the individual, rather than state, perspective, it is only where the Ohio Constitution grants greater rights to the individual than are granted by the United States Constitution that the Ohio constitutional provisions need be separately examined. This is true because the states cannot restrict individual rights afforded by the United States Constitution in a manner not permitted by that Constitution.

Plaintiffs first rely upon Section 1, Article I, Ohio Constitution, which provides as follows:

"All men are, by nature, free and independent, and have certain inalienable rights, among which are those of enjoying and defending life and liberty, acquiring, possessing, and protecting property, and seeking and obtaining happiness and safety." [3]

It has long been recognized in Ohio that this constitutional provision grants extensive rights to the individual, it being expressly held in paragraph one of the syllabus of *Palmer & Crawford v. Tingle* (1896), 55 Ohio St. 423, 45 N.E. 313, that:

"The inalienable right of enjoying liberty and acquiring property, guaranteed by the first section of the bill of rights of the constitution, embraces the right to be free in the enjoyment of our faculties, subject only to such restraints as are necessary for the common welfare."

In that case, the Supreme Court held that the right to contract "can be restrained by the general assembly only so far as such restraint is for the

---

**3.** The word "men" as used in this section and as used in the Declaration of Independence is used in its generic sense and includes all people. The language of this provision, having been contained in Section 1, Article VIII of the 1802 Ohio Constitution, was derived both from the Bill of Rights of the United States Constitution and the Declaration of Independence.

common welfare and equal protection and benefit of the people." *Id.* at 441, 45 N.E. at 315.

 Section 1, Article I, Ohio Constitution, together with Section 2, Article I, Ohio Constitution (together originally contained in Section 1, Article VIII of the 1802 Ohio Constitution), make it quite clear that, under the Ohio Constitution's Bill of Rights, every person has inalienable rights under natural law which cannot be unduly restricted by government, which is formed for the purpose of securing and protecting those rights, and that all governmental power depends upon the consent of the people. Thus, the Ohio constitutional provision is broader in that it appears to recognize so-called "natural law," which is not expressly recognized by the Bill of Rights or any other provision of the United States Constitution, although it is recognized in the Declaration of Independence.[4] In that sense, the Ohio Constitution confers greater rights than are conferred by the United States Constitution, although that Constitution has been construed very broadly so as to maximize the nature of the individual rights guaranteed by it. This is explained in part in *Palmer & Crawford, supra,* 55 Ohio St. at 441, 45 N.E. at 314, as follows:

"The word 'liberty,' as used in the first section of the Bill of Rights does not mean a mere freedom from physical restraint or state of slavery, but is deemed to embrace the right of man to be free in the enjoyment of the faculties with which he has been endowed by his Creator, subject only to such restraints as are necessary for the common welfare."

In general, this provision guaranteeing the enjoyment of life and liberty confers upon the individual the right to do whatever he or she wishes to do so long as there is no valid law proscribing such conduct and so long as the conduct does not infringe upon rights of others recognized by the common law. It is only where there is a law prohibiting express conduct that one may not so act. In all other cases, the person doing an act which unduly interferes with the enjoyment of life and liberty by others is responsible for damages or other sanctions for such act.

 Therefore, the initial question posed is whether Section 1, Article I, Ohio Constitution includes within the liberties afforded the right of a woman to choose to have an abortion. In light of the broad scope of "liberty" as used in the Ohio Constitution, it would seem almost axiomatic that the right of a woman to choose whether to bear a child is a liberty within the constitutional protection. This necessarily includes the right of a woman to choose to have an abortion so long as there is no valid and constitutional statute restricting or limiting that right.

---

4. Arguably, "natural law" concepts are recognized by the "freedom" of speech, press, and religion clauses of the First Amendment and by the "liberty" provisions of the Fifth and Fourteenth Amendments to the United States Constitution.

Some courts have taken a circuitous route to reach a conclusion that the so-called "right to choose" has a constitutional foundation by first finding a constitutional right of privacy and then finding that the right of a woman to choose to have an abortion falls within this right of privacy. Although Ohio recognizes a common-law right of privacy, *Housh v. Peth* (1956), 165 Ohio St. 35, 59 O.O. 60, 133 N.E.2d 340, it is not necessary to find a constitutional right of privacy in order to reach the conclusion that the choice of a woman whether to bear a child is one of the liberties guaranteed by Section 1, Article I, Ohio Constitution. This determination, however, does not end the inquiry since the validity of the statute depends upon whether it abridges this constitutional right, which in turn depends upon the nature and extent of such right.[5]

In the public discussion of the issue, we often hear the words "right to choose" or "right to life" as if each were some type of constitutional absolute. However, under the Constitution, there are no absolutes; each right, no matter how fundamental or basic it may appear to be, must be balanced against the rights of others, including the rights of the public generally. Although it still seems to echo, the contention that a woman's right to have an abortion is absolute was put to rest when the right was first recognized in *Roe v. Wade* (1973), 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147, wherein it is stated at 153–154, 93 S.Ct. at 727, 35 L.Ed.2d at 177–178:

"[A]ppellant and some *amici* argue that the woman's right is absolute and that she is entitled to terminate her pregnancy at whatever time, in whatever way, and for whatever reason she alone chooses. With this we do not agree. * * *

" * * * We, therefore, conclude that the right of personal privacy includes the abortion decision, but that this right is not unqualified and must be considered against important state interests in regulation."

In *Roe*, at 154, 93 S.Ct. at 727, 35 L.Ed.2d at 177, these important state considerations were expressly found to include "important interests in safeguarding health, in maintaining medical standards, and in protecting potential life." However, the court also stated that, "at some point in pregnancy, these respective interests become sufficiently compelling to sustain regulation of the factors that govern the abortion decision." The *Roe* court then went on to state, 410 U.S. at 164, 93 S.Ct. at 732, 35 L.Ed.2d at 183, that: "For the stage prior to approximately the end of the first trimester, the abortion decision and its effectuation must be left to the medical judgment of the pregnant woman's attending physician." The

---

5. Even though the Ohio Constitution confers broader liberty rights upon a woman than does the United States Constitution, this does not mean that the balancing between those rights and the state's interest in potential life in determining validity of legislation must use the federal test of undue burden. Instead, the state may use either a lesser or greater standard.

*Roe* court then noted that, during the second trimester, the state may regulate abortion relative to maternal health and that, during the third trimester, the state may prohibit abortion except if necessary for preservation of the life or health of the mother.[6]

Although the basic holding of *Roe* has not been overruled, the plurality opinion in *Planned Parenthood* rejected and modified the trimester and compelling-state-interest tests adopted in *Roe*. At present, only two Justices of the United States Supreme Court still adhere to *Roe,* four Justices in dissents stating that *Roe* should be overruled. However, all the Justices (including at least to a limited extent the four dissenting Justices), recognized that one of the liberties guaranteed by the Fourteenth Amendment to the United States Constitution is the right of a woman to choose whether to bear a child, including whether to choose to have an abortion. In doing so, in the plurality opinion, Justice O'Connor noted, 505 U.S. at ——, 112 S.Ct. at 2806, 120 L.Ed.2d at 697, that "[s]ome of us as individuals find abortion offensive to our most basic principles of morality," but further indicated that that personal view "cannot control our decision," since a court's "obligation is to define the liberty of all, not to mandate our own moral code." *Id.* In the concurring and dissenting opinion of Chief Justice Rehnquist (concurred in by three other Justices), it is stated, 505 U.S. at ——, 112 S.Ct. at 2867, 120 L.Ed.2d at 773, that: "We think that the correct analysis is that * * * [a] woman's interest in having an abortion is a form of liberty protected by the Due Process Clause, but States may regulate abortion procedures in ways rationally related to a legitimate state interest." [7]

As in most instances of constitutional construction, what is before us is a balancing, namely, the balancing of the state's "profound interest in potential life" against a woman's personal right to choose whether she should bear a child. However, there are several tests that courts have applied in making this balancing of interests, including a rational-basis test, a substantial-basis test, a substantial-interest test, a compelling-state-interest test and, most recently, an undue-burden test. The first four of these tests are predicated upon the nature of the state's interest advanced by the regulation in question. The new undue-burden test set forth in *Planned Parenthood* focuses upon the effect upon the

---

6. The *Roe* court, 410 U.S. at 164, 93 S.Ct. at 732, 35 L.Ed.2d at 183, used a trimester approach but held the state could prohibit abortion after "viability" (the third trimester). The plurality in *Planned Parenthood* also proscribes prohibition of abortion before "viability" but without trimester consideration.

7. However, in the concurring and dissenting opinion by Justice Scalia concurred in by the same justices, it is stated, 505 U.S. at ——, 112 S.Ct. at 2874, 120 L.Ed.2d at 783, that the power of a woman to abort her unborn child is not a liberty protected by the United States Constitution.

person wishing to exercise a constitutional right, rather than upon the nature of the interest of the state in regulating exercise of that right.[8] The *Planned Parenthood* court adopted the undue-burden test, rejecting the trimester framework of *Roe,* stating, 505 U.S. at ——, 112 S.Ct. at 2821, 120 L.Ed.2d at 715–716:

"(a) To protect the central right recognized by *Roe v. Wade* while at the same time accommodating the State's profound interest in potential life, we employ the undue burden analysis as explained in this opinion. An undue burden exists, and therefore a provision of law is invalid if its purpose or effect is to place 'a substantial obstacle in the path of a woman seeking an abortion before the fetus attains viability.

"(b) We reject the rigid trimester framework of *Roe v. Wade.* To promote the State's profound interest in potential life, throughout pregnancy the State may take measures to ensure that the woman's choice is informed, and measures designed to advance this interest will not be invalidated as long as their purpose is to persuade the woman to choose childbirth over abortion. These measures must not be an undue burden on the right.

"\* \* \*

"(d) \* \* \* Regardless of whether exceptions are made for particular circumstances, a State may not prohibit any woman from making the ultimate decision to terminate her pregnancy before viability.

"(e) We also reaffirm *Roe's* holding that 'subsequent to viability, the State in promoting its interest in the potentiality of human life may, if it chooses, regulate, and even proscribe, abortion except where it is necessary, in appropriate medical judgment, for the preservation of the life or health of the mother.' "

The foregoing quotation from the plurality decision in *Planned Parenthood* constitutes the present state of federal constitutional law. Even if we construe the Ohio Constitution to impose fewer limitations upon state action than set forth in the plurality opinion in *Planned Parenthood,* we must nevertheless adhere to the standard of the plurality in *Planned Parenthood* as to application of the United States Constitution.

Thus, as a practical matter, we have little choice but to apply the undue-burden standard to our interpretation of the Ohio constitutional provisions, except to the extent, if any, that they afford greater restrictions upon state action than are

---

**8.** The new undue-burden test appears to be somewhat similar to that used by courts in determining the constitutionality of a law in its application to a particular person under special circumstances as opposed to determining facial constitutionality of the same law.

imposed by the federal constitution.[9] Plaintiffs, on the other hand, urge us to continue to apply the compelling-state-interest test, as do the *amici* supporting their position. There is simply nothing demonstrated to justify the utilization of a compelling-state-interest test. Seven of the nine Justices of the United States Supreme Court have rejected that view; three of them would apply the undue-burden test, and the other four the rational-basis test. However, we are not free to apply the rational-basis test even if we are of the opinion that that is the appropriate test to be applied under the Ohio Constitution.[10]

Accordingly, the trial court erred in applying the compelling-state-interest test to the legislation at issue, which led to the erroneous conclusion that the statute is unconstitutional. We find no infirmity in the legislation. H.B. No. 108, which is the subject of this action, enacts R.C. 2317.56(B), which does not directly regulate the right of a woman to have an abortion but, instead, places certain duties upon a physician and prohibits the physician from performing an abortion unless the physician has informed the pregnant woman "verbally or by other nonwritten means of communication" at least twenty-four hours prior to performance of an abortion of the following:

"(a) The nature and purpose of the particular abortion procedure to be used and the medical risks associated with that procedure;

"(b) The probable gestational age of the embryo or fetus;

"(c) The medical risks associated with the pregnant woman carrying her pregnancy to term."

This information must be given "in an individual, private setting" such that gives the pregnant woman "an adequate opportunity to ask questions about the abortion that will be performed or induced." In addition, twenty-four hours prior to the performance of the abortion, the physician must notify the pregnant woman of the name of the physician scheduled to perform or induce the abortion and give her copies of certain published materials described in the statute. The woman is not required to examine the material, and the physician may comment upon the materials and disassociate himself or herself from them if the physician

---

9. This does not mean, as intimated in the dissenting and concurring opinion, that we are required to follow the undue-burden test of *Planned Parenthood* to the Ohio Constitution, but only that we are not free to find constitutional a statute that violates the United States Constitution as interpreted by *Planned Parenthood* on the basis that the Ohio Constitution is not violated, but are free to find a statute to violate the Ohio Constitution, even though it does not violate the United States Constitution.

10. Although we are not free to apply that test, the writer of this opinion is of the view that the analysis of Chief Justice Rehnquist is more appropriate as to the nature of the right to have an abortion but that the substantial-interest test should be applied under the Ohio Constitution in testing state regulation of abortion.

so desires. In addition, the statute requires that, prior to performance or inducement of an abortion, the pregnant woman must sign a consent form certifying that the statute has been complied with.

The statute further provides that an abortion may be performed without following the statutory procedure in case of a medical emergency or medical necessity, the existence of which is left to the judgment of the physician.[11] Additionally, the statute further provides for a civil remedy and possible disciplinary action against the licensed physician but no criminal penalty against a physician who violates the provisions of the statute. We are unable to distinguish the Ohio statutes from the Pennsylvania statutes involved in *Planned Parenthood* and find no basis for determining Section 1, Article I, Ohio Constitution imposes greater restrictions upon the state than are imposed by the United States Constitution as construed by the plurality opinion in *Planned Parenthood.*[12]

The trial court's opinion relies in large part upon the fact that neither *Akron v. Akron Ctr. for Reproductive Health* (1983), 462 U.S. 416, 103 S.Ct. 2481, 76 L.Ed.2d 687, nor *Thornburgh v. Am. College of Obstetricians & Gynecologists* (1986), 476 U.S. 747, 106 S.Ct. 2169, 90 L.Ed.2d 779, had been modified or overruled at the time of the trial court's decision. However, as indicated, these cases were both overruled to the extent inconsistent with *Planned Parenthood,* necessitating a different conclusion from that reached by the trial court.

Plaintiffs also contend that the statute is in violation of Section 7, Article I, Ohio Constitution, which provides in pertinent part:

"All men have a natural and an indefeasible right to *worship Almighty God* according to the dictates of their own conscience. No person shall be compelled to attend, erect, or support any place of worship, or maintain any form of worship, against his consent; and no preference shall be given, by law, to any religious society; nor shall any interference with the rights of conscience be permitted. No religious test shall be required, as a qualification for office, nor shall any person be incompetent to be a witness on account of his religious belief; but nothing herein shall be construed to dispense with oaths and affirmations. Religion, morality, and knowledge, however, being essential to good government, it shall be the duty of the general assembly to pass suitable laws to protect every

---

**11.** Thus, the Ohio statute leaves to the judgment of the physician the circumstances under which a medical necessity or medical emergency exists because of rape, mental illness, or other factors, including protection of the life of the pregnant woman.

**12.** In reaching its conclusions, *Planned Parenthood* overruled the decisions in *Akron v. Akron Ctr. for Reproductive Health* (1983), 462 U.S. 416, 103 S.Ct. 2481, 76 L.Ed.2d 687, and *Thornburgh v. Am. College of Obstetricians & Gynecologists* (1986), 476 U.S. 747, 106 S.Ct. 2169, 90 L.Ed.2d 779, to the extent they are inconsistent with the plurality opinion in *Planned Parenthood.*

religious denomination in the peaceful enjoyment of its own mode of public worship, and to encourage schools and the means of instruction." (Emphasis added.)

Plaintiffs contend that this section confers a general right of "conscience," irrespective of and unconnected to religious freedom. There is nothing in either the language or the history of Section 7, Article I, Ohio Constitution supporting plaintiffs' contention. Even though the United States Supreme Court has construed the Establishment Clause of the First Amendment to the United States Constitution to include nonreligion as well as religion (see *Cty. of Alleghe-ny v. ACLU, Greater Pittsburgh Chapter* [1989], 492 U.S. 573, 109 S.Ct. 3086, 106 L.Ed.2d 472), the language of Section 7, Article I, Ohio Constitution does not permit such a construction. The first sentence defines the right intended, namely, the "natural and indefeasible right to worship Almighty God," which precludes an interpretation that a right of conscience unconnected with religion is intended to be protected by this section. In other words, the word "conscience" is taken in a religious context, not a secular context as is contended by plaintiffs. See *State v. Biddings* (1988), 49 Ohio App.3d 83, 85, 550 N.E.2d 975, 979. See, also, paragraph one of the syllabus of *In Re Milton* (1987), 29 Ohio St.3d 20, 29 OBR 373, 505 N.E.2d 255.

The word "conscience" denotes a sense of moral goodness as to which conduct is right and which is wrong. In a secular sense, such intellectual feelings may vary from person to person, but they are protected by Section 7, Article I, Ohio Constitution only when predicated upon bona fide religious beliefs, even though the word "conscience" in a secular sense necessarily includes moral and philo-sophical views not within the confines of established religion. Such secular concepts of "conscience" may have some constitutional protection (see discussion of "liberty," *supra* ), but such protection is not afforded by Section 7, Article I, Ohio Constitution.

Plaintiffs refer to this construction of this Ohio constitutional provision as being a "narrow construction." On the contrary, it is the construction of the plain meaning of the constitutional provision, which by its clear and unambiguous terms ties the "rights of conscience" to the exercise of religion.

Plaintiffs also contend that, even under the proper construction of Section 7, Article I, Ohio Constitution, it is violated by H.B. No. 108. To reach this conclusion, plaintiffs point out that moral beliefs as to abortion are frequently predicated upon religious beliefs and principles. Even if we were to agree with plaintiffs' contention that "a state mandated message disapproving of abortion constitutes governmental effort to force women to adhere to a particular religious

viewpoint," [13] that is neither the purpose nor effect of H.B. No. 108. As indicated above and in *Planned Parenthood, supra*, the balancing of rights and affording a proper perspective to the various constitutional rights involved permit the state to promote its interest by requiring that a woman be fully informed as to all aspects of continuing a pregnancy or terminating it by abortion and by requiring a twenty-four-hour period between the giving of such information and proceeding with the abortion procedure. There is no facial invalidity of H.B. No. 108 upon the basis of application of Section 7, Article I, Ohio Constitution, no religious rights having been infringed upon. There is no suggestion or inference that religious beliefs are involved either with respect to the giving of the required information or with respect to the required twenty-four-hour waiting period.

Plaintiffs also contend that H.B. No. 108 is in violation of Section 11, Article I, Ohio Constitution, which provides that:

"Every citizen may freely speak, write, and publish his sentiments on all subjects, being responsible for the abuse of the right; and no law shall be passed to restrain or abridge the liberty of speech, or of the press."

Even assuming, as plaintiffs contend, that this language is broader than the First Amendment to the United States Constitution, plaintiffs have in no way demonstrated any violation of this constitutional provision by H.B. No. 108.

There is nothing in H.B. No. 108 prohibiting anyone from freely speaking, writing, or publishing his or her sentiments on any subject, including that of abortion. Although H.B. No. 108 requires the giving of certain state-printed materials, it does not prohibit the giving of any other materials to a woman contemplating an abortion. Rather, R.C. 2317.56(B)(1) requires certain information to be given by a physician in addition to the information described in R.C. 2317.56(C). The latter section requires the Department of Health to publish in both English and Spanish material including information about family planning and public funding agencies which will assist in family planning, and of agencies which will assist through pregnancy and after childbirth. (R.C. 2317.56[C][1].) Information must also be included as to the probable anatomical and physiological characteristics of the embryo or fetus at two-week gestational increments for the first sixteen weeks of pregnancy and at four-week gestational increments from then until full term. (R.C. 2317.56[C][2].) Such information is required to be

---

**13.** Justice O'Connor in the plurality opinion in *Planned Parenthood* expressly states, 505 U.S. at ——, 112 S.Ct. at 2825, 120 L.Ed.2d at 720, that "under the undue burden standard a State is permitted to enact persuasive measures which favor childbirth over abortion, even if those measures do not further a health interest." She also noted, 505 U.S. at ——, 112 S.Ct. at 2821, 120 L.Ed.2d at 716, that measures designed to ensure that a woman's choice to have an abortion is an informed one "will not be invalidated as long as their purpose is to persuade the woman to choose childbirth over abortion."

"objective and nonjudgmental" and to include only "accurate scientific information." This information is in addition to any that the physician personally must give orally or by "nonwritten means," pursuant to R.C. 2317.56(B). There is no restriction upon the freedom of speech of anyone, although there is a duty placed upon a physician to give accurate information to the pregnant woman contemplating an abortion. R.C. 2317.56(G) provides that a violation of R.C. 2317.56(B) may subject the offending physician to a civil action for compensatory and exemplary damages or for disciplinary action under R.C. 4731.22. This, however, does not constitute interference with the physician's freedom of speech, any more than does the availability of a civil action for defamation.

Plaintiffs' concern that the Department of Health may not comply with the statutory mandate that the material be objective and nonjudgmental and include only accurate scientific information does not give rise to a violation of the freedom of speech provisions of Section 11, Article I, Ohio Constitution. This court will not presume that the Department of Health will not comply with the mandate of the statute, and any such contention is premature in any event.[14]

Plaintiffs also contend that H.B. No. 108 violates the Equal Protection Clause of the Ohio Constitution set forth in Section 2, Article I, which reads as follows:

"All political power is inherent in the people. Government is instituted for their equal protection and benefit, and they have the right to alter, reform, or abolish the same, whenever they may deem it necessary; and no special privileges or immunities shall ever be granted, that may not be altered, revoked, or repealed by the general assembly."

In this regard, plaintiffs also contend that H.B. No. 108 violates the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution. In support of its contention, plaintiffs point out that the direct impact of any measure regulating or restricting abortion falls on a class consisting exclusively of women. In urging this conclusion, plaintiffs rely upon the sophistry of the dissenting opinion by Justice Blackmun in *Planned Parenthood, supra.*

The Ohio Supreme Court has frequently held that the equal protection guarantee of Section 2, Article I of the Ohio Constitution is essentially identical to that afforded by the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution. As stated in the opinion by former Chief Justice O'Neill in *Kinney v. Kaiser Aluminum & Chem. Corp.* (1975), 41 Ohio St.2d 120, 123, 70 O.O.2d 205, 207–208, 322 N.E.2d 880, 882–883:

---

14. See, however, footnote 11, *supra.*

"The limitations placed upon governmental action by the Equal Protection Clauses of the Ohio and United States constitutions are essentially identical. * * * Although equal protection of the laws does not totally prevent legislative classification, it does require the existence of reasonable grounds for making a distinction between those within and those outside a designated class. * * * The 'reasonableness' of a statutory classification is dependent upon the purpose of the Act." See, also, *State ex rel. Heller v. Miller* (1980), 61 Ohio St.2d 6, 8, 15 O.O.3d 3, 4–5, 399 N.E.2d 66, 67, and *Beatty v. Akron City Hosp.* (1981), 67 Ohio St.2d 483, 21 O.O.3d 302, 424 N.E.2d 586. More recently, in the opinion by Chief Justice Moyer in *Conley v. Shearer* (1992), 64 Ohio St.3d 284, 288–289, 595 N.E.2d 862, 866–867, it is stated:

" 'Equal protection of the law means the protection of equal laws. It does not preclude class legislation or class action provided there is a reasonable basis for such classification. The prohibition against the denial of equal protection of the laws requires that the law shall have an equality of operation on persons according to their relation. So long as the laws are applicable to all persons under like circumstances and do not subject individuals to an arbitrary exercise of power and operate alike upon all persons similarly situated, it suffices the constitutional prohibition against denial of equal protection of the laws. * * *' *Dayton v. Keys* (1969), 21 Ohio Misc. 105, 114, 50 O.O.2d 29, 34, 252 N.E.2d 655, 660.

" * * *

"The test used in determining whether a statute is constitutional under the Equal Protection Clause depends upon whether a fundamental interest or suspect class is involved. 'Under the equal protection clause, in the absence of state action impinging on a fundamental interest or involving a suspect class, a rational basis analysis is normally used. Where the traditional rational basis test is used great deference is paid to the state, the only requirement being to show that the differential treatment is rationally related to some legitimate state interest.' [Quoting *Heller, supra.*] * * * Where a fundamental interest or suspect class is at issue, a stricter test is used * * * and the government will have to demonstrate that a classification created by law is necessary to promote a compelling governmental interest."

In *Geduldig v. Aiello* (1974), 417 U.S. 484, 94 S.Ct. 2485, 41 L.Ed.2d 256, and in *Gen. Elec. Co. v. Gilbert* (1976), 429 U.S. 125, 97 S.Ct. 401, 50 L.Ed.2d 343, the United States Supreme Court held that an exclusion of pregnancy from a disability benefits plan otherwise providing general coverage is not gender-based discrimination under the Fourteenth Amendment. As stated in *Geduldig,* at 496–497, 94 S.Ct. at 2492, 41 L.Ed.2d at 265, fn. 20, and quoted with approval in *Gilbert:*

"While it is true that only women can become pregnant, it does not follow that every legislative classification concerning pregnancy is a sex-based classification * * *. * * * Absent a showing that distinctions involving pregnancy are mere pretexts designed to effect an invidious discrimination against the members of one sex or the other, lawmakers are constitutionally free to include or exclude pregnancy from the coverage of legislation such as this on any reasonable basis just as with respect to any other physical condition."

Furthermore, it must be borne in mind that the plurality opinion in *Planned Parenthood* predicated its determination upon equal protection principles applied to the Due Process Clause. It is difficult to conceive how the Equal Protection Clause of the Fourteenth Amendment could be violated by a statutory provision meeting the test set forth in the plurality opinion of *Planned Parenthood.* As stated in *Planned Parenthood,* 505 U.S. at ——, 112 S.Ct. at 2823–2824, 120 L.Ed.2d at 719:

"We conclude, however, that informed choice need not be defined in such narrow terms that all considerations of the effect on the fetus are made irrelevant. As we have made clear, we depart from the holdings of *Akron I* and *Thornburgh* to the extent that we permit a State to further its legitimate goal of protecting the life of the unborn by enacting legislation aimed at ensuring a decision that is mature and informed, even when in so doing the State expresses a preference for childbirth over abortion. In short, requiring that the woman be informed of the availability of information relating to fetal development and the assistance available should she decide to carry the pregnancy to full term is a reasonable measure to insure an informed choice, one which might cause a woman to choose childbirth over abortion. This requirement cannot be considered a substantial obstacle to obtaining an abortion, and, it follows, there is no undue burden."

Basically, plaintiffs argue that, because only women can become pregnant (and, thus, have an abortion), any state regulation of abortion necessarily constitutes a gender-based classification which is subject to strict scrutiny and is deemed unconstitutional unless a compelling state interest is demonstrated. This concept is contrary to the holding in *Planned Parenthood,* even though that court did not reach the equal protection analysis. In support of its gender-based classification contention, plaintiffs rely in part upon *Michael M. v. Superior Court of Sonoma Cty.* (1981), 450 U.S. 464, 101 S.Ct. 1200, 67 L.Ed.2d 437. However, the plurality opinion in that case states at 468, 101 S.Ct. at 1204, 67 L.Ed.2d at 442:

"[W]e have not held that gender-based classifications are 'inherently suspect' and thus we do not apply so-called 'strict scrutiny' to those classifications. * * * Our cases have held, however, that the traditional minimum rationality test takes on a somewhat 'sharper focus' when gender-based classifications are challenged.

* * * In *Reed v. Reed,* 404 U.S. 71, 92 S.Ct. 251, 30 L.Ed.2d 225 (1971), for example, the Court stated that a gender-based classification will be upheld if it bears a 'fair and substantial relationship' to legitimate state ends[.]"

The court continued with an analysis and explanation that:

"But because the Equal Protection Clause does not 'demand that a statute necessarily applied equally to all persons' or require ' "things which are different in fact ... to be treated in law as though they were the same," ' * * * this Court has consistently upheld statutes where the gender classification is not invidious, but rather realistically reflects the fact that the sexes are not similarly situated in certain circumstances."

In short, the United States Supreme Court has not determined that all gender-based classifications are *per se* subject to strict scrutiny requiring a compelling state interest to be constitutionally valid. To the contrary, the United States Supreme Court has consistently applied a heightened rationality test to such gender-based regulations sometimes referring to a requirement that the proponents must show "that the classification is tailored to further an important governmental interest and must demonstrate an 'exceedingly persuasive justification' for the classification." *Kirchberg v. Feenstra* (1981), 450 U.S. 455, 101 S.Ct. 1195, 67 L.Ed.2d 428, decided the same day as *Michael M., supra.* For the same reasons that the Pennsylvania statute in *Planned Parenthood* was found not to violate the Due Process Clause of the Fourteenth Amendment, it necessarily follows that H.B. No. 108 does not violate the Equal Protection Clause of the Fourteenth Amendment solely because it is a gender-based classification in the sense that, because of the subject matter, it can apply directly only to women. Likewise, we find no reason to apply a different standard under the Ohio Constitution. There simply is no rational argument meeting logical scrutiny that permits such a conclusion, which can be reached only by a subjective result-oriented analysis.

We must emphasize that what is before us is only facial constitutionality of the statute. Although a xerographic copy of an early draft of a brochure was attached to an affidavit of one of plaintiffs' witnesses, there is no evidence that this draft has been or will be adopted or published by the state.[15] Rather, the evidence suggests to the contrary. It would be improper for this court to base our determination upon a review of that brochure, which would violate the statute to the extent it is biased or slanted, skewed or offensive. R.C. 2317.56(B)(3)(b) requires that the physician give the pregnant woman the "printed material" described in R.C. 2317.56(C), which requires the printed material to provide

---

15. Apparently, the proposed brochure has gone through several drafts, but no approved draft or brochure was placed into evidence.

family planning information and a list of agencies offering services and information as to available medical assistance benefits which does not "directly or indirectly promote, exclude or discourage the use of any agency." The printed material also is required to "inform the pregnant woman of the probable anatomical and physiological characteristics of the zygote, blastocyte, embryo or fetus at two-week gestational increments for the first sixteen weeks" and at four-week gestational increments during the remainder of the "pregnancy to full term." The material is permitted but not required to use pictorial or photographic means, but if it does an appropriate scale or explanation must be included.

Most important, however, the material must "use language that is understandable by the average person * * * be objective and nonjudgmental, and * * * include only accurate scientific information." It is doubtful that the brochure attached to plaintiffs' witness's affidavit meets this test, but that issue is not before us for determination in this case.

As we stated *supra* with respect to the First Amendment issue raised as to the same statutory provisions, plaintiffs' concern that the Department of Health may not comply with the statutory mandate that the material be objective and nonjudgmental is, at best, premature since no such material has yet been published by the Department of Health. This court cannot assume that the Department of Health will not comply with the mandate of the statute and must confine our consideration to whether the statute facially violates equal protection—that is, whether no material can be developed which meets both the requirements of the statute and the requirements of equal protection. Facially, the statute does not violate equal protection under the heightened scrutiny required for gender-based legislation since it does not place an undue burden upon the pregnant woman contemplating abortion and serves a substantial interest of the state.

However, there is one additional equal protection argument which is not predicated upon a gender-based classification. This is a contention that the abortion procedure should not be singled out from all other surgical procedures for special regulation. This contention applies both to procedures which can involve only women (such as hysterectomies and caesareans), as well as procedures which can be performed upon either men or women. Clearly, there is a classification, the issue being whether this classification is so unreasonable as to be unconstitutional. In *Geduldig, supra,* 417 U.S. at 495, 94 S.Ct. at 2485, 41 L.Ed.2d at 263-264, the Supreme Court stated:

"This Court has held that, consistently with the Equal Protection Clause, a State 'may take one step at a time, addressing itself to the phase of the problem which seems most acute to the legislative mind. . . . The legislature may select

one phase of one field and apply a remedy there, neglecting the others....' \* \* \* Particularly with respect to social welfare programs, so long as the line drawn by the State is rationally supportable, the courts will not interpose their judgment as to the appropriate stopping point. '[T]he Equal Protection Clause does not require that a State must choose between attacking every aspect of a problem or not attacking the problem at all.'" (Citations omitted.)

More important, there is a state interest with respect to abortion not present with respect to other surgical procedures. The state interest in informed consent with respect to almost all other surgical procedures involves protection of the person upon whom the surgery will be performed. Although the same is true with respect to an abortion, there is an additional factor recognized originally in *Roe, supra,* and more recently in *Planned Parenthood.* To the extent constitutionally permissible, regulation of abortion is predicated upon what *Roe* described as the state's interest in protecting fetal life or potential life, as well as the state's important and legitimate interest in preserving and protecting the health of the pregnant woman. In *Planned Parenthood,* 505 U.S. at ——, 112 S.Ct. at 2820, 120 L.Ed.2d at 714, the plurality opinion states that "there is a substantial State interest in potential life throughout pregnancy." Accordingly, the provision of H.B. No. 108 serves a double purpose, both that of furthering the health and safety of a woman seeking an abortion and that of preserving and furthering the state's interest in protecting fetal life or potential life throughout pregnancy. This distinction is sufficient to justify placing abortion in a separate classification from other surgical procedures insofar as special provisions assuring informed consent to an abortion.[16] As indicated above, in *Planned Parenthood,* 505 U.S. at ——, 112 S.Ct. at 2821, 120 L.Ed.2d at 716, the Supreme Court expressly stated: "To promote the State's profound interest in potential life, throughout pregnancy, the state may take measures to ensure that the woman's choice is informed." We see no reason to apply a more restrictive standard upon the state under the Ohio Constitution than that placed in *Planned Parenthood* through the United States Constitution, which is summarized at 505 U.S. at ——, 112 S.Ct. at 2821, 120 L.Ed.2d at 715, as follows:

"What is at stake is the woman's right to make the ultimate decision, not a right to be insulated from all others in doing so. Regulations which do no more than create a structural mechanism by which the State, or the parent or guardian of a minor, may express profound respect for the life of the unborn are permitted, if they are not a substantial obstacle to the woman's exercise of the right to

---

16. Although the use of the term "informed consent" may not encompass the full breadth of H.B. No. 108, it is sufficiently clear that the purpose of H.B. No. 108 is to assist a woman in making a rational and informed decision concerning abortion when confronted with the necessity of making that difficult decision.

choose. * * * Unless it has that effect on her right of choice, a state measure designed to persuade her to choose childbirth over abortion will be upheld if reasonably related to that goal. Regulations designed to foster the health of a woman seeking an abortion are valid if they do not constitute an undue burden."

We find nothing in H.B. No. 108 which interferes with a pregnant woman's right to choose whether to bear the child or to have an abortion to such an extent as to constitute an undue burden [17] upon the exercise of that right, which terminates when the unborn child becomes viable.

All too often the constitutional aspects of the issue become confused with the moral aspects of the issue. Although our Constitutions and most laws are predicated upon moral principles, they do not encompass or include all moral principles or all morality. In considering constitutional issues of this nature, courts cannot and do not reflect their personal moral standards. Rather, courts must apply constitutional provisions and statutes as they are found and balance the conflicting interests that may be involved fairly and impartially. In so doing, not only the actual provisions of the Constitutions, but precedent and especially binding decisions of higher courts (in our case the Ohio Supreme Court and the United States Supreme Court) must be adhered to.

 In this case, we are guided by *Planned Parenthood,* which does establish the standards under the United States Constitution. Although the state is free to apply its own constitution differently from the way the United States Supreme Court determines the federal constitution should be applied, we find no reason under the circumstances of this case to find that the Ohio Constitution confers upon a pregnant woman a greater right to choose whether to have an abortion or bear the child than is conferred by the United States Constitution, as explained in the plurality opinion of *Planned Parenthood.* Stated conversely, we see no reason for finding that the Ohio Constitution places greater restrictions upon state action than are placed by the United States Constitution as construed in the plurality opinion of *Planned Parenthood.*

Accordingly, the second assignment of error is well taken in that the trial court erred in declaring divisions (A) through (H) of R.C. 2317.56 and R.C. 4731.-22(B)(23) to be facially unconstitutional under the Ohio Constitution.

For the foregoing reasons, both assignments of error are sustained, the judgment of the Franklin County Court of Common Pleas is reversed, and this cause is remanded to that court with instructions to enter a declaratory judgment

---

17. The undue-burden test is frequently used in the equal protection context.

declaring divisions (A) through (H) of R.C. 2317.56 and R.C. 4731.22(B)(23) to be facially constitutional under both the United States and Ohio Constitutions.

*Judgment reversed*
*and cause remanded*
*with instructions.*

JOHN C. YOUNG, J., concurs.

PETREE, J., concurs in part and dissents in part.

PETREE, Judge, concurring in part and dissenting in part.

The issue presented in this case is whether H.B. No. 108, on its face, violates the Bill of Rights of the Ohio Constitution. The trial court found this legislation insupportable under the Ohio Constitution, resting its decision on the strict scrutiny standard formulated in the landmark case of *Roe v. Wade* (1973), 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147, and its progeny. Since the United States Supreme Court has subsequently reexamined the underpinnings of *Roe* in the recent decision of *Planned Parenthood of Southeastern Pennsylvania v. Casey* (1992), 505 U.S. ——, 112 S.Ct. 2791, 120 L.Ed.2d 674, it is necessary to address the propriety of the trial court's ruling in this regard. Because I find that *Casey* should not control here and that the Equal Protection and Benefit Clause of the Ohio Constitution [18] was violated with respect to R.C. 2317.56(B)(3)(b), I must respectfully dissent.

In *Casey,* the United States Supreme Court was presented with the issue of whether certain restrictions on abortion passed by the Pennsylvania legislature ran afoul of the so-called implied "right of privacy" found in the United States Constitution. In a lengthy, fractured decision, a bare majority of the court voted to strike down the Pennsylvania spousal-consent provision but then voted to uphold other provisions, allowing, *inter alia,* a waiting period for abortion services, broad regulations on informed consent and abortion counseling, and other such restrictions. Identical or similar provisions had been previously struck down in post-*Roe* cases.[19] Four Justices rigorously dissented in *Casey* and

---

**18.** Section 2, Article I of the Ohio Constitution states:

"All political power is inherent in the people. Government is instituted for their equal protection and benefit, and they have a right to alter, reform, or abolish the same, whenever they may deem it necessary; and no special privileges or immunities shall ever be granted, that may not be altered, revoked, or repealed by the general assembly."

**19.** *Akron v. Akron Ctr. for Reproductive Health, Inc.* (1983), 462 U.S. 416, 103 S.Ct. 2481, 76 L.Ed.2d 687; *Thornburgh v. Am. College of Obstetricians & Gynecologists* (1986), 476 U.S. 747, 106 S.Ct. 2149, 90 L.Ed.2d 779.

aired their individual views that *Roe* should have been overruled outright and that the whole issue of abortion should now be subjected to minimum judicial scrutiny so that state legislatures would be unconstrained to develop their own rules in this troubling and difficult area. Under such scrutiny, these judges would have upheld all of the challenged abortion constraints struck down in *Casey.*

Because the instant case is predicated on the individual rights protections contained in the Ohio Constitution's Bill of Rights, as opposed to those contained in federal law, it is necessary to commence the discussion of the impact of *Casey* here with an analysis of the relationship between our state constitutional jurisprudence and federal constitutional jurisprudence.[20]

## I

The Ohio Constitution and its Bill of Rights have always been the primary foundation of civil rights and civil liberties protection for Ohioans.[21] It is undeniable from an examination of the language and history of the federal and state Constitutions that our government was founded pursuant to principles of federalism, whereby the federal Constitution would create and limit the power of the federal government with few restrictions on the plenary power of the several states. *Debolt v. Ohio Life Ins. & Trust Co.* (1853), 1 Ohio St. 563. These basic principles of federalism embodied in our constitutional government inform us that this court is completely free to interpret the Ohio Constitution without adherence to the outcome of court decisions in similar cases at the federal level. For the United States Constitution provides a floor, not a ceiling, for individual rights enjoyed by state citizens. *PruneYard Shopping Ctr. v. Robbins* (1980), 447 U.S. 74, 100 S.Ct. 2035, 64 L.Ed.2d 741; *State v. Brown* (1992), 63 Ohio St.3d 349, 588 N.E.2d 113.

---

**20.** At present, only a handful of courts have tried to grapple with the impact of *Casey* on abortion law. *Sojourner v. Edwards* (C.A.5, 1992), 974 F.2d 27 (striking down Louisiana statute prohibiting termination of pregnancy except in cases of rape or incest, or to save the life of the mother or unborn baby); *Planned Parenthood v. Neely* (D.Ariz.1992), 804 F.Supp. 1210 (holding unconstitutional statute requiring parental consent except when there was a "serious risk" to the minor); *In re Petition No. 349* (Okla.1992), 838 P.2d 1 (holding unconstitutional initiative effort to ban previability nontherapeutic abortions except in cases of rape, incest, grave physical or mental defect of the fetus, or grave impairment of mother's physical or mental health); *Barnes v. Moore* (C.A.5, 1992), 970 F.2d 12, 13 (upholding Mississippi informed consent act "substantially identical" to Pennsylvania waiting period and nonmandatory informed-consent provisions sanctioned in *Casey*).

**21.** Indeed, unlike the federal Bill of Rights, the Ohio Constitution *begins* with its Bill of Rights, thereby emphasizing the prominence our Constitution affords to the protection of individual rights.

Though the passage of the post-Civil War amendments changed the original structure of federalism to allow federal protection for individual rights through the due process and the equal protection guarantees of the federal Constitution, and though many issues thereby came under the purview of federal constitutional law, this alteration in the constitutional landscape in no way changed the foundation for constitutional protection for Ohioans. That foundation in our own state Constitution deserves equal dignity, respect and attention from our courts, regardless of the shifting sands of the federal government.

Of course, the development and expansion of federal individual rights safeguards has not been without effect on state constitutional jurisprudence. It is abundantly clear that the United States Supreme Court has acted as a *de facto* leader in the development of doctrine and that state courts have followed that guidance, with Ohio as no exception. The benefits of this approach, of course, have been uniformity and ease; but the costs have been a retarded development in our own individual state constitutional law.[22]

In the recent past, some judges and commentators have called on state courts to independently interpret their own constitutional individual rights provisions, no doubt in response to the perceived retrenchment of the Burger and Rehnquist courts from the Warren court's ideals and activism. See Brennan, State Constitutions and the Protection of Individual Rights (1977), 90 Harv.L.Rev. 489. Yet, there is nothing in our constitution which charges that we take a stance of activism and constant recognition of rights. Again, the Ohio Constitution has stood firm, as it always has, as the source of individual rights guarantees for Ohioans. As always, then, this court should interpret our Constitution's provisions in accordance with the intent of the framers of this fundamental charter, with proper recognition of the development of our history and law.

Manifestly, Ohio courts have a duty, then, to recognize and apply any different language in our own Constitution as it is written. When there are parallel provisions in the United States Constitution with the same or similar language, we should seek to follow the United States Supreme Court decisions interpreting those provisions, unless there are good reasons not to do so. *Brown, supra.*

Accordingly, we must make clear here that *Casey* does not establish any binding federal precedent. Though a great deal of the *Casey* opinion was devoted to the efficacy of the trimester framework contained in *Roe* and use of the so-called "compelling-state-interest" test that goes along with that frame-

---

**22.** It is not uncommon, for instance, for Ohio attorneys to be totally unfamiliar with the important cases or developments in Ohio constitutional law, while at the same time showing conversance with, for instance, the major decisions on federal abortion law by name and significance. See, generally, Porter & Tarr, The New Judicial Federalism and the Ohio Supreme Court: Anatomy of a Failure (1984), 45 Ohio St. L.J. 143.

work, there was no majority opinion in *Casey* on these subjects that could serve to guide federal courts, let alone this court. Certainly the newly composed "undue-burden" standard, previously espoused by Justice O'Connor and contained in the *Casey* plurality opinion, demands no recognition from this Ohio court. It is inconceivable that the framers of our Constitution contemplated that Ohio courts, when interpreting our Ohio Constitution, would simply count the heads in the federal court and somehow divine where they think they are going.

Hence, I cannot understand the majority's intimations that we must follow *Casey* and that we must use the undue-burden standard in the *Casey* plurality opinion. That plurality opinion is not binding law in the present case and the majority opinion should not create any impression to the contrary. It is painfully obvious that the United States Supreme Court has been unable to agree on the appropriate criteria against which abortion regulations should be judged. The lengthy *Casey* decision only reflects the heated and sometimes out-of-bounds debate carried on by the members of the court in the pages of the United States Reports and in the public eye.

Moreover, the plurality opinion should not be used in this case because it is entirely unpersuasive in analysis and application. As the dissenters pointed out, the newly minted undue-burden standard has no counterpart in federal constitutional law and provides no guidance on which abortion restrictions will survive judicial scrutiny.[23] Indeed, Chief Justice Rehnquist himself characterized the plurality opinion as a "constitutional compromise" that offered no framework for further analysis. *Casey, supra,* 505 U.S. at —, 112 S.Ct. at 2855–2856, 120 L.Ed.2d at 759.

As *Casey* provides no real leadership in this area, we have to endeavor to do justice to the language of the Ohio Constitution in its own right. Hence, the issue presented here is what level of judicial scrutiny is required for abortion services regulation under the Ohio Constitution's Bill of Rights.

## II

The starting point for all questions of individual rights in Ohio is, fittingly, the Liberty Clause of Section 1, Article I, Ohio Constitution, which has no counter-

---

**23.** The plurality opinion characterized a "finding of an undue burden [as] a shorthand for the conclusion that a state regulation has the purpose or effect of placing a substantial obstacle in the path of a woman seeking an abortion of a nonviable fetus." *Casey,* 505 U.S. at —, 112 S.Ct. at 2820, 120 L.Ed.2d at 714. By contrast, Justice Stevens's idea was that "[a] burden may be 'undue' either because the burden is too severe or because it lacks a legitimate, rational justification." *Id.* at —, 112 S.Ct. at 2842–2843, 120 L.Ed.2d at 743 (Stevens, J., concurring in part and dissenting in part). Neither formulation received five votes so that there would be controlling constitutional doctrine.

part in the federal Constitution. It was recognized long ago that this clause reflects that all people in Ohio are born with liberty and have the substantive right to enjoy it, subject only to the restrictions imposed by valid laws necessary for the common welfare. *Palmer & Crawford v. Tingle* (1896), 55 Ohio St. 423, 45 N.E. 313. Hence, by virtue of this simple principle, Ohioans may do anything, including terminate a pregnancy, unless there is a valid law against it.

To be valid, of course, the law must be within the ambit of the legislative power and must not contravene any rights guaranteed by the Ohio Constitution. As a general principle of constitutional judicial review, legislation is presumed to be constitutional unless it is demonstrated otherwise. *Sedar v. Knowlton Constr. Co.* (1990), 49 Ohio St.3d 193, 551 N.E.2d 938; *State ex rel. Dickman v. Defenbacher* (1955), 164 Ohio St. 142, 57 O.O. 134, 128 N.E.2d 59. So long as there is some reasonable basis for the legislation, it will be sustained. *Bd. of Edn. v. Walter* (1979), 58 Ohio St.2d 368, 12 O.O.3d 327, 390 N.E.2d 813. This analysis, it is said, coincides with the federal "rational-basis" test and will most likely result in the legislation being upheld. By contrast, when legislation impinges on the enjoyment of a constitutional guarantee, stricter judicial scrutiny is warranted. Such legislation is presumptively unconstitutional unless demonstrated otherwise. It will therefore be struck down unless the state shows a compelling interest and that the legislation, as written, is narrowly tailored to serve that interest. *Id.* at 373–374, 12 O.O.3d at 330–331, 390 N.E.2d at 817–818.

To trigger stricter scrutiny, then, there must be an infringement of a right guaranteed by the text of the Ohio Constitution. Of course, the specific guarantees of the Bill of Rights, which were placed in the Constitution to limit the authority of the will of the majority, are rights guaranteed which must be so protected. But as Section 20, Article I, declares, these are not the only rights of the people recognized by the document.

While federal abortion law has been predicated on the so-called fundamental "right to privacy," which was read into the federal Constitution as an implied concept underlying other specific Bill of Rights guarantees tangentially related to privacy, we really need not rest our decision in this case on recognition of such an amorphous, hard-to-define concept. Though other state courts[24] around the nation have echoed the "emanation" and "penumbra" elocution which Justice Douglas crafted in *Griswold v. Connecticut* (1965), 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510, a case which voided a state ban on contraceptives, we should not thoughtlessly confine ourselves to the federal court's decisions, and the problems

---

24. The New Jersey Supreme Court in construing that state's own Constitution, which contains a broad-based Liberty Clause like Ohio's, did find a right to privacy implicit in that state's constitution. *Right to Choose v. Byrne* (1982), 91 N.J. 287, 450 A.2d 925.

they have brought, in this regard. Concededly, if we do have authority to give recognition to some natural inalienable rights in the constitution, it should only be done conservatively and with great caution.

The Supreme Court of the United States on numerous occasions has found certain rights fundamental by *necessary* implication from other specific constitutional guarantees. For instance, freedom of association, *NAACP v. Alabama ex rel. Patterson* (1958), 357 U.S. 449, 78 S.Ct. 1163, 2 L.Ed.2d 1488, the right to travel, *Shapiro v. Thompson* (1969), 394 U.S. 618, 89 S.Ct. 1322, 22 L.Ed.2d 600, and the right to vote, *Harper v. Virginia State Bd. of Elections* (1966), 383 U.S. 663, 86 S.Ct. 1079, 16 L.Ed.2d 169, must have been contemplated as necessary preconditions to the exercise of our express constitutional guarantees. This same analysis supports a fundamental right to bodily integrity.[25]

There are numerous express protections in the Ohio Bill of Rights which secure freedom of thought and enjoyment of one's faculties. The Free Speech Clause and the Conscience Clause, in particular, are predicated on the notion that the government should not be able to dictate or control one's thoughts, whether related to politics, religion, or other matters. It is undeniable that one's mind is absolutely interconnected with one's body. Control of one can be control of the other. If the state could alter a person's body, for whatever reason, it would assuredly affect his or her faculties. The case of *Skinner v. Oklahoma* (1942), 316 U.S. 535, 62 S.Ct. 1110, 86 L.Ed. 1655, is illustrative. There, the United States Supreme Court struck down a statute requiring compulsory sterilization of some, but not all, convicted criminals. Indeed, it is hard to imagine even in the abstract that the state could inject people with drugs, surgically alter their bodies, or use other instruments of technology, so that the populace would accept official doctrine, for instance, and that the Ohio Constitution would serve as no real barrier to such unconscionable actions. What would stop the state from

---

**25.** Though much of the larger debate in this area of constitutional law has focused on defining the "right to privacy" as either some all-encompassing libertarian principle in line with the philosophy of John Stuart Mill or some core recognition of family values central to American tradition, a number of judges and commentators have acknowledged that a basic concern in the abortion arena is the protection of bodily integrity. The *Casey* plurality opinion states that "*Roe*, however, may be seen not only as an exemplar of *Griswold* liberty but as a rule (whether mistaken or not) of personal autonomy and bodily integrity. * * *" *Casey, supra*, 505 U.S. at ——, 112 S.Ct. at 2810, 120 L.Ed.2d at 702. Justice Stevens likewise states "[i]n counterpoise [to the state's interest in potential human life] is the woman's constitutional interest in liberty. One aspect of this liberty is a right to bodily integrity, a right to control one's person. * * *" *Id.* at ——, 112 S.Ct. at 2840, 120 L.Ed.2d at 740. Justice Blackmun's dissent also states that "* * * restrictive abortion laws force women to endure physical invasions far more substantial than those this Court has held to violate the constitutional principle of bodily integrity in other contexts." *Id.* at ——, 112 S.Ct. at 2846, 120 L.Ed.2d at 748. See, also, Regan, Rewriting *Roe v. Wade* (1979), 77 Mich.L.Rev. 1569. Hence, we need not enter the morass of issues concerning general autonomy against government, such as whether someone has a right to sexual freedom or a right to be homosexual.

ordering one person to donate bodily tissue to another for the sake of the common welfare? It would have been utterly irrational for the framers of our Constitution to have contemplated strict safeguards for protection of thought while at the same time allowing all sorts of intrusions into the body.

Manifestly, a fundamental right to bodily integrity must be acknowledged as a necessary precondition to the enjoyment of our express guarantees of freedom in the Ohio Bill of Rights. While this essential right, like most rights, is by no means absolute, it certainly demands at least some stricter judicial scrutiny, else the fundamental safeguards for our freedoms would be rendered hollow and meaningless, now and in the future.

Moreover, regulation of abortion inherently impacts on a right to bodily integrity. A state's effort to compel birth, for instance, subjects females to the tremendous demands and the innate risks of reproduction, an unquestionably indelible event for any living organism, and especially for a woman in our society. One cannot deny that pregnancy consumes a woman's life in a profound way, physically, mentally, emotionally and perhaps spiritually. In accordance with this significant impact, we should hold that the abortion regulation, which is truly *sui generis,* is subject to a form of intensified constitutional scrutiny, beyond mere rational-basis review.

This does not mean, however, that all legislation regulating abortion should be struck down. On the contrary, the state has many legitimate as well as important interests in this area. One of those interests is the protection of life and potential life. Indeed, as a community, our interest in the preservation of human life is important and worthy of respect by our law.

### III

Under the Equal Protection and Benefit Clause of the Ohio Constitution, legislation must treat similarly situated people equally. This means that, when the legislature draws lines and thereby creates classifications among people, those lines must be supported by some reasonable basis when measured against the legitimate purposes or objects of the legislation. Courts generally will give great deference to the legislature in this regard, acknowledging the difficulty that inheres in such a task. But the means selected will be examined more closely when the legislation is based on either a suspect classification or if it encroaches upon a fundamental right. *Conley v. Shearer* (1992), 64 Ohio St.3d 284, 595 N.E.2d 862.

In the past, federal courts have recognized several suspect classifications, like race, which is expressly mentioned in the federal Constitution. *Strauder v. West Virginia* (1880), 100 U.S. 303, 25 L.Ed. 664. Gender-based classifications have

been treated as less dubious on account of the bona fide physical differences between men and women. Hence, gender-based classifications are deemed quasi- or semi-suspect classifications that deserve a kind of semi-strict scrutiny. *Craig v. Boren* (1976), 429 U.S. 190, 204, 97 S.Ct. 451, 460, 50 L.Ed.2d 397, 411. That is, courts will perform a form of intermediate review of the legislative means to determine whether the legislation passes constitutional muster. *Id.*[26]

A classification is gender-based if it is expressly based on sex as a criterion in the statute itself or if a seemingly neutral criterion is really by design or pretext a regulation based on sex. In *Geduldig v. Aiello* (1974), 417 U.S. 484, 94 S.Ct. 2485, 41 L.Ed.2d 256, modified by statute on other grounds as stated in *Newport News Shipbuilding & Dry Dock Co. v. Equal Emp. Opportunity Comm.* (1983), 462 U.S. 669, 103 S.Ct. 2622, 77 L.Ed.2d 89, the United States Supreme Court held that a classification based on pregnancy was not a gender-based classification because it classified between pregnant persons and "nonpregnant persons." The court reasoned that only women were in the class of pregnant persons, but both men and women were in the class of nonpregnant persons. Hence, Justice Stewart, who authored the majority opinion, concluded in a footnote that pregnancy was not really a gender-based criterion. *Id.* at 496–497, 103 S.Ct. at 2528, 76 L.Ed.2d at 748–749, fn. 20. The court then upheld the exclusion of pregnancy from coverage under a state insurance program, though similar health matters concerning men were covered.

*Geduldig, supra,* has not been accorded much favor in the larger picture of constitutional law. The case, though apparently still good law at the federal level, has been criticized and is rarely cited by the United States Supreme Court itself.[27] We should avoid uncritical acceptance of *Geduldig* in Ohio. Though the Ohio Supreme Court often follows federal decisions in the equal protection area, there is no mandate we do so here.[28] In short, it would be an entirely positive

---

26. Under *Craig,* classifications by gender "must serve important governmental objectives and must be substantially related to achievement of those objectives." *Id.,* 429 U.S. at 197, 97 S.Ct. at 457, 50 L.Ed.2d at 407.

27. Only recently has the *Geduldig* case and its equal protection analysis come before the court. Fittingly, it occurred in *Bray v. Alexandria Women's Health Clinic* (1993), 506 U.S. ——, 113 S.Ct. 753, 122 L.Ed.2d 34, a case involving the application of the federal Ku Klux Klan Act to bar Operation Rescue, an anti-abortion protest group, from picketing at an abortion clinic. Though Justice Scalia's majority opinion was predicated on whether the Act applied and whether invidious discrimination by the protesters occurred against women in general, his footnote 3, along with Justice Steven's dissent, only serve to highlight the court's troubles with *Geduldig.*

28. One would assume, for instance, that the Ohio Supreme Court would not follow the so-called "irrebuttable presumption" cases that have been criticized by commentators as devoid of reasoned analysis under neutral principles of constitutional law. See, *e.g., Cleveland Bd. of*

development in the law if we reject *Geduldig* analysis in the present context and treat abortion as a sexual equality issue.[29] Given the substantial impact on the female gender of laws regulating reproduction, the aforementioned serious concerns about control over bodily integrity implicit in our constitutional order, and the profound and pragmatic reality of such laws in application to the female gender, it is only fair that such laws be subjected to intermediate level scrutiny by Ohio courts.[30] Plainly, H.B. No. 108 is a provision regulating abortion services conducted on women. Its special waiting periods, informed consent protections, and counseling mandates will never apply in like measure to a man getting a vasectomy or making other important reproductive decisions affecting society.

Notwithstanding, the same type of intermediate scrutiny employed in gender-based cases would be required here, at minimum, if we recognize a fundamental right over bodily integrity implicit in our constitutional order. Hence, the issue becomes whether the individual provisions of H.B. No. 108 provide equal protection and benefit of the laws to Ohioans.

## IV

The trial court essentially found H.B. No. 108 unconstitutional *in toto* on a variety of constitutional grounds. In applying equal protection analysis in the instant case, we should uphold the "waiting" period and physician disclosure provisions, uphold the medically based informed consent provisions, and uphold the mandated information on abortion alternatives, but we should strike down the mandatory requirement for conveyance of explicit information about incremental fetal development.

As the trial court found, there was information in the record that the waiting period would be burdensome to women, especially poor women living in rural counties in Ohio. The statute appears to require two trips to the family planning clinic instead of one, thereby increasing the cost and arguably the risks of the

---

*Edn. v. LaFleur* (1974), 414 U.S. 632, 652, 94 S.Ct. 791, 802, 39 L.Ed.2d 52, 67. In *Bray, supra*, Justice Stevens persuasively limits *Geduldig* to situations involving a denial of benefits with an overall nondiscriminatory effect. *Bray, supra*, 506 U.S. at ——, 113 S.Ct. at 760, 122 L.Ed.2d at 49.

**29.** Other courts have appeared to have done so as well. See *Doe v. Maher* (1986), 40 Conn.Sup. 394, 443–444, 515 A.2d 134, 159; *Planned Parenthood v. Dept. of Human Resources* (1983), 63 Or.App. 41, 60–61, 663 P.2d 1247, 1260.

**30.** See Sunstein, Neutrality in Constitutional Law (With Special Reference to Pornography, Abortion, and Surrogacy) (1992), 92 Colum.L.Rev. 1, 32–33. Accord, Ginsburg, Some Thoughts on Autonomy and Equality in Relation to *Roe v. Wade* (1985), 63 N.C.L.Rev. 376, 386 ("Overall, the Court's *Roe* position is weakened, I believe by the opinion's concentration on a medically approved autonomy idea, to the exclusion of a constitutionally based sex-equality perspective. * * * ").

procedure. But there was evidence that went unrebutted to demonstrate that many women have to make multiple trips anyway. For instance, if a pregnancy test at the Preterm Clinic indicates a second-trimester pregnancy, the woman will often have to be rescheduled and return to the clinic as soon as possible because second-trimester abortions entail more complicated medical procedures. Clearly a waiting period, with ample provision for emergency situations, would foster reflection about important medical decisions. Though we are unaware of similar waiting periods for other types of medical procedures, this is not fatal. No doubt there are many situations where medical providers perform questionable and perhaps unnecessary surgeries, such as hysterectomies, where a waiting period might serve to quell unthinking acceptance of a doctor's conclusion. This is not too far afield of the common insurance company practice of requiring second opinions before invasive procedures are undertaken.

Likewise, the provision requiring informed consent on material health risks is also facially acceptable. Such procedures are required for most all surgeries in any event, whether performed on women or men. Informed-consent law has developed under our common law and by state statute to protect all people in their fundamental sovereignty over their bodies. See *Nickell v. Gonzales* (1985), 17 Ohio St.3d 136, 17 OBR 281, 477 N.E.2d 1145, and R.C. 2317.54. Indeed, the requirement for informing the woman about abortion alternatives, such as adoption, does not appear to require anything grossly out of the ordinary in the medical setting. Moreover, requiring that the name of the doctor scheduled to perform the surgery be given to the patient could lessen the occurrence of malpractice.

Antithetically, the measure mandating that state-prepared materials on incremental fetal development be sent to every single woman regardless of circumstances simply cannot be sustained.[31] This provision, which requires that such materials be sent to the woman just prior to having the procedure, as opposed to the Pennsylvania statute in *Casey* which only required that the physician *inform* the woman about the *existence* of such materials,[32] is absolutely alien to any concept of "informed" consent to surgery.

---

**31.** This is to be distinguished from informing the woman of the probable gestational age of the fetus, which is just another way of telling the woman how far along she is in her pregnancy, an important medical concern that is entirely supportable.

**32.** Mandating that a woman receive such abortion materials poses more harm than simply informing a woman about the existence of such materials. The latter situation allows the woman at least a chance to avoid repulsive materials that may harm her, while the former does not. The Pennsylvania Right to Know Statute, 18 Pa.Cons.Stat.Ann. Section 3205(a)(2)(i), reprinted in the appendix of *Casey*, 505 U.S. at ——, 112 U.S. at 2834, 120 L.Ed.2d at 731, only required the physician to inform the pregnant woman that the Department of Health "publishes printed materials which describe the unborn child and list agencies

Concededly, this provision is designed to make the woman ponder or think twice about the moral interests of the fetus and, while such materials are supposed to be "nonjudgmental," they are inherently judgmental in such a context.[33] To be sure, there is not a single such statute relating to medical procedures performed on men. While such fetal materials are not necessarily the only message which can be conveyed by the clinic or physician, it is inherently inflammatory, misleading, and constitutes true undue influence at a time in a woman's life that may be the most vulnerable and stressful.

Imagine receiving a document like the one in the record, emblazoned by the state with the label "Informed Consent," which upon opening it contains graphic, larger-than-life depictions of the week-by-week development of a fetus. The document begins with the phrase about fertilization that says, "On the first day, conception for life begins." It focuses on any similarities of the fetus to human beings but obscures distinguishing features, like the lack of individuation, motility, cognition and volition. It depicts the size development of the fetus from little "head" to "rump" and emphasizes the development of human characteristics like limb buds, ears, fingers and toes. Imagine too that you are a woman who wants more than anything to give birth to a bouncing, healthy baby but, instead, has been told that diagnosis has shown that her developing child has no arms or legs or brain. The woman must nevertheless receive these abortion messages about healthy baby development, though her child, through some stroke of misfortune, can only suffer pain from coming into this world. The lack of humanity in this rigid statute is enough to shock the conscience of the court and only bolsters the argument that this constriction on abortion is only a pretext designed to condemn, punish, and shock as many women out of abortion as possible, whatever the cost.[34]

which offer alternatives to abortion and that she has a right to review the printed materials and that a copy will be provided free of charge if she chooses to review it."

**33.** Justice Blackmun's majority opinion in *Thornburgh v. Am. College of Obstetricians & Gynecologists, supra,* though decided before *Casey,* examines a similar statute and finds it unconstitutional under federal law. The opinion's concerns over this type of mandated message still have much persuasive force. The Ohio provision is especially troublesome because it allows for misleading communication. Like the example in the record, the information on a fetus can state "objective" facts and be "nonjudgmental" about the woman's moral choice but still can be slanted or skewed in favor of an anti-abortion stance.

**34.** Also, there are no exceptions for situations where the woman is raped, mentally ill, suicidal and so on. By contrast, the Pennsylvania statute allowed for the physician to disregard "informed consent" if there was a serious risk to the woman's physical or mental health. 18 Pa.Cons.Stat. (1990), Section 3205, quoted in the plurality opinion of *Casey,* 505 U.S. at ——, 112 S.Ct. at 2824, 120 L.Ed.2d at 710–720.

Indeed, apart from anecdotal affidavits, there is no scientific evidence in the record that women suffer serious psychological effects from not knowing the development of the fetus *at the time of having an abortion.*[35] Though a woman certainly would suffer some psychic injury in any event because of the unpleasantness of the circumstances, such as when the clinic of necessity makes arrangements for payment for termination of pregnancy, one has to feel that pitting the state against the woman in this setting and in this fashion steps outside the bounds of normal human decency.

Assuming that it is legitimate for the state to moralize on this subject[36] in an effort to persuade women about ethical consequences, we should also note that the state's purposes could be served by less inhumane legislation. The state's interest in preserving human life could be furthered by public advertisements or educational programs about the ethical consequences of abortion. Materials could be made available for the patient's perusal, as opposed to a mandated reception of same. See footnote 15, *supra.*

For the foregoing reasons, I concur that the trial court erred in finding R.C. 2317.56(B)(1), (B)(2) and (B)(3)(a) unconstitutional. I must respectfully dissent because I find R.C. 2317.56(B)(3)(b) unconstitutional.

---

**35.** For a thorough study of this topic, see Russo, Psychological Aspects of Unwanted Pregnancy and Its Resolution, printed in Butler & Walbert, Abortion, Medicine, and the Law (1992) 593. The appendix of this comprehensive and insightful book contains U.S. Surgeon General C. Everett Koop's Report on the Health Effects of Abortion, commissioned by President Ronald W. Reagan. The surgeon general found inconclusive evidence of psychological problems stemming from abortion. *Id.* at 739.

**36.** Federal courts appeared to have found similar "right to know" laws in violation of the First Amendment. *Planned Parenthood League of Mass. v. Bellotti* (C.A.1, 1981), 641 F.2d 1006, 1021–1022; *Charles v. Carey* (C.A.7, 1980), 627 F.2d 772, 784; *Women's Med. Ctr. of Providence v. Roberts* (D.R.I.1982), 530 F.Supp. 1136, 1153–1154.