No. 126,406

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

JEFFERY A. SANDERS,
*Appellant*.

SYLLABUS BY THE COURT

1.

Whether a person is considered a child in Kansas is statutorily different than whether one is considered of sufficient age to consent to sexual intercourse. The Kansas Legislature has the power to determine the age at which being a minor ends, and K.S.A. 38-101 identifies it as 18 years of age.

2.

In Kansas, under K.S.A. 21-5507(a)(1)(A), persons 16 years of age or older can lawfully consent to sexual intercourse.

3.

Under the facts of this case, we reject the defendant's claim that making and distributing child pornography is a constitutionally protected activity simply because the minor could lawfully consent to sexual activity.

4.

We adopt the reasoning in *State v. Senters*, 270 Neb. 19, 26-27, 699 N.W.2d 810 (2005), that the State has a legitimate reason to ban the creation of child pornography because it is often associated with child abuse and exploitation, resulting in physical and psychological harm to the child, and due to the potential for reputational harm.

5.

Aggravated intimidation of a witness, K.S.A. 21-5909(b), is not a separate offense controlled by K.S.A. 21-5301 or subject to the reduced penalty provisions of that statute. Because the aggravated intimidation of a witness statute includes attempt language, the offense is complete even when a defendant attempts to prevent or dissuade a witness. So the identical offense doctrine does not apply to such a conviction.

6.

Under K.S.A. 20-370(a), a defendant convicted of a crime against a minor victim must pay a $400 assessment fee for each crime committed against a minor, not each complaint or information.

Appeal from Sedgwick District Court; ERIC WILLIAMS, judge. Submitted without oral argument. Opinion filed January 10, 2025. Affirmed in part, vacated in part, and remanded with directions.

*Sam Schirer*, of Kansas Appellate Defender Office, for appellant.

*Matt J. Maloney*, assistant district attorney, *Marc Bennett*, district attorney, and *Kris W. Kobach*, attorney general, for appellee.

Before ARNOLD-BURGER, C.J., GARDNER and CLINE, JJ.

ARNOLD-BURGER, C.J.:  A jury convicted Jeffery A. Sanders of multiple counts of sexual exploitation of a child for enticing 16-year-old Jane Doe (a pseudonym for the

victim in the case) to send him nude pictures and for possessing a video of one of their sexual encounters. He was also convicted of one count of aggravated intimidation of a witness or victim for attempting to discourage Doe from revealing their relationship to law enforcement.

On appeal, Sanders raises several challenges to his convictions and resulting sentence, arguing: (1) the sexual exploitation of a child statute is unconstitutional as applied because it improperly criminalizes private, consensual sexual conduct; (2) the identical offense doctrine applies to his aggravated intimidation of a witness or victim charge, requiring resentencing; (3) the State failed to allege and prove his age to support imposing lifetime postrelease supervision; (4) lifetime postrelease supervision is cruel and unusual punishment; (5) the district court erred in requiring him to pay four Children's Advocacy Center fees instead of a single fee; and (6) the journal entry of sentencing must be corrected because the court ordered a lower witness mileage fee at sentencing than the amount shown on the journal entry. The State concedes the journal entry is incorrect and must be corrected. As to this last issue, we agree, and remand the case for correction of the journal entry. We affirm on all remaining issues.

FACTUAL AND PROCEDURAL HISTORY

The facts here are not in dispute. Given the issues presented in this appeal, we need not recount the evidence in detail. We will focus only on the facts related to the charges for which Sanders was convicted.

*The volleyball coach grooms a 14-year-old player for sex.*

Sometime in 2015, Doe began playing volleyball at a facility where Sanders, 41, was a coach. Sanders became friends with Doe's parents and eventually began communicating with 14-year-old Doe on Snapchat. Their messages were initially about

3

volleyball but eventually became more personal, then sexual, in nature. Sanders began complimenting Doe on her body and revealed that he had dreams about having sexual intercourse with her.

*The coach starts having sexual intercourse with the player after she turns 16, recording the encounters on his cell phone, and they exchange explicit photos via Snapchat.*

About a month after she turned 16, Sanders kissed Doe during a private volleyball lesson. A month later, Sanders invited Doe to his house, where they had sexual intercourse for the first time. Sanders recorded this and many of their sexual encounters on his cell phone. Doe stated at trial that she did not want to view any of these videos but knew Sanders was recording them. The jury found Sanders guilty of sexual exploitation of a child in violation of K.S.A. 21-5510(a)(2) for possessing one of these videos. Although Doe had initially resisted several requests by Sanders to provide nude pictures of herself, she eventually relented, and they began regularly exchanging nude pictures on Snapchat as well. These requests formed the basis for one of Sanders' convictions for sexual exploitation of a child in violation of K.S.A. 21-5510(a)(1).

*The player tells a friend about her sexual relationship with the coach and the friend contacts the police.*

At some point between late 2017 and early 2018, Doe told a friend about her sexual relationship with Sanders and that disclosure led to the police filing a report. When a detective interviewed Doe, she first denied anything inappropriate had happened. Later in the interview, she acknowledged she had been having sexual intercourse with Sanders.

4

*Before her interview with the police, the coach told the player not to say anything and mentioned he had a loaded firearm.*

Before the interview, Sanders had messaged Doe "not to say anything" and reminded her that she knew what would happen if anyone found out about the relationship and mentioned he had a loaded firearm. These messages supported Sanders' aggravated intimidation of a witness conviction.

*The coach continues to ask for lewd pictures of the player, who complies.*

After Doe's interview with police, her parents restricted her social media usage by taking away her phone. She later bypassed these restrictions by logging into her Instagram account on her friend's phone. Later at a sleepover, a friend intercepted messages between Sanders and Doe on Doe's phone. Sanders asked Doe to send nude pictures of herself. After she sent a photo of her vagina to Sanders, Doe's friend saw the picture and told her own mother what happened. The friend's mother then contacted law enforcement. This incident formed the basis for Sanders' final conviction for sexual exploitation of a child.

*The coach is convicted after a jury trial.*

A jury convicted Sanders of two counts of sexual exploitation of a child under K.S.A. 21-5510(a)(1) (inducing a child under 18 to engage in sexually explicit conduct with the intent to promote any performance), one count of sexual exploitation of a child under K.S.A. 21-5510 (a)(2) (possession of a visual depiction of a someone under the age of 18 in which the child is engaged in sexually explicit conduct with the intent to arouse the sexual desires or prurient interests of any person); and one count of aggravated intimidation of a witness under K.S.A. 21- 5909(a)(2)(A) (attempting to prevent a victim from reporting the victimization to law enforcement when the victim is under 18).

5

Although Doe could legally consent to sexual intercourse with Sanders because of her age, the sexual exploitation of a child charges stemmed from Sanders requesting nude pictures of Doe.

*The coach is sentenced to 10 years in prison and assessed fines and costs.*

At sentencing, the district court found Sanders' criminal history score was I and imposed a controlling sentence of 122 months in prison based on a combination of consecutive, aggravated prison terms on his four convictions capped under the "double rule." See K.S.A. 21-6819(b)(4). The court also imposed lifetime postrelease supervision and ordered Sanders to pay "ordinary costs and fees," which included a $151.26 witness mileage fee. The court's journal entry of judgment, however, indicated a $315.01 witness mileage fee, as well as a $1,600 "Children's Advocacy Center fee." Before the hearing ended, the court granted defense counsel leave to brief a constitutional challenge to the lifetime postrelease supervision term based on *State v. Freeman*, 223 Kan. 362, Syl. ¶ 2, 574 P.2d 950 (1978). The court later held a hearing on the motion and ruled the lifetime postrelease supervision term was constitutional after evaluating the *Freeman* factors in a lengthy oral ruling and concluding all three prongs weighed against Sanders.

Sanders timely appealed.

ANALYSIS

Sanders does not challenge any of the facts established during trial. Instead, the basic premise of his constitutional and statutory arguments is that Kansas sets the age of consent for sexual intercourse at 16 years old. See K.S.A. 21-5507(a)(1)(A). Therefore, his requests to exchange nude images with Doe and his possession of videos depicting their sexual encounters amounted to private, consensual sexual conduct that is entitled to

6

protection under the Due Process Clauses of both the United States and Kansas Constitutions.

Under this theory, he raises several constitutional and statutory claims we will address in turn, but our standard of review is the same on all—unlimited. *State v. Carr*, 314 Kan. 615, 646, 502 P.3d 546 (2022) (holding the constitutionality of a statute is a question of law subject to unlimited review), *cert. denied* 143 S. Ct. 581 (2023); *State v. Betts*, 316 Kan. 191, 197, 514 P.3d 341 (2022) (finding statutory interpretation presents a question of law over which appellate courts have unlimited review).

I.      *K.S.A. 21-5510 is not unconstitutional as applied to Sanders.*

Sanders argues K.S.A. 21-5510 is unconstitutional as applied to him because sexual privacy between consenting participants is a form of liberty interest protected by the Due Process Clause of the Fourteenth Amendment to the United States Constitution—as well as its counterpart found in section 18 of the Kansas Constitution Bill of Rights. And for the first time on appeal, Sanders also contends section 1 of the Kansas Constitution Bill of Rights confers a "'right to privacy'" as a "'natural right'" which prevents the State from criminalizing his private, consensual sexual conduct. See *Hodes & Nauser, MDs v. Schmidt*, 309 Kan. 610, Syl. ¶ 8, 440 P.3d 461 (2019) (*Hodes I*) (recognizing right to personal autonomy); see also *Hodes & Nauser v. Kobach*, 318 Kan. 940, 950, 551 P.3d 37 (2024) (*Hodes II*) (reaffirming *Hodes I*); *Hodes & Nauser v. Stanek*, 318 Kan. 995, 1005, 551 P.3d 62 (2024) (*Hodes III*) (same).

A.  *Sanders fails to properly preserve his claim under section 1 of the Kansas Constitution Bill of Rights.*

To begin, Sanders concedes that he is raising his constitutional claim based on section 1 of the Kansas Constitution Bill of Rights for the first time on appeal. Accordingly, to review this claim Sanders must justify application of a recognized

7

exception to the prohibition against considering constitutional issues raised for the first time on appeal. And while the record shows Sanders indeed raised his arguments based on the Fourteenth Amendment and section 18 of the Kansas Constitution Bill of Rights in a pretrial motion to dismiss two of the charges, his motion to dismiss only challenged the constitutionality of K.S.A. 21-5510(a)(1). This is true because the State had not yet added any charge based on K.S.A. 21-5510(a)(2) when he filed his motion.

Sanders fails to explain why he neglected to incorporate his constitutional claim when he moved to dismiss the new charges based on (a)(2), simply offering that the issue was nonetheless preserved because his rationale "applies equally" to both subsections of the statute (sections 1 and 18). But preserving a constitutional challenge for appeal is not so simple.

Sanders does not establish that this court must invoke any of the recognized exceptions to consider an unpreserved issue for the first time on appeal. See *State v. Rhoiney*, 314 Kan. 497, 500, 501 P.3d 368 (2021) ("[A] 'decision to review an unpreserved claim under an exception is a prudential one.' Even if an exception may apply, we are under no obligation to review the claim. [Citation omitted.]"). Sanders contends his as applied constitutional challenge to K.S.A. 21-5510 can be reviewed for the first time on appeal because it (1) presents a purely legal question arising on undisputed facts and its resolution would be finally determinative of the case, and (2) is necessary to review the claim to prevent the denial of a fundamental right. *State v. Allen*, 314 Kan. 280, 283, 497 P.3d 566 (2021) (recognizing these exceptions).

Contrary to Sanders' suggestion, the only relevant fact is not simply that he was "convicted of crimes based on his private, consensual sexual conduct with an individual above Kansas's age of consent." While Sanders discusses his sexual exploitation of a child convictions under the general umbrella term of "exchanging sexual imagery," it bears mentioning that subsections (a)(1) and (a)(2) prohibit entirely different conduct.

8

K.S.A. 21-5510(a)(1) prohibits "[e]mploying, using, persuading, inducing, enticing or coercing a child under 18 years of age, or a person whom the offender believes to be a child under 18 years of age, to engage in sexually explicit conduct with the intent to promote any performance." But K.S.A. 21-5510(a)(2) prohibits "possessing any visual depiction of a child under 18 years of age shown or heard engaging in sexually explicit conduct with intent to arouse or satisfy the sexual desires or appeal to the prurient interest of the offender or any other person. " In other words, subsection (a)(1) covers the creation of child pornography, while subsection (a)(2) covers mere possession.

This distinction matters because the entire premise of Sanders' constitutional arguments is built on an alleged infringement of his fundamental right to engage in private and *consensual* sexual activity. Yet only the charges based on subsection (a)(1) directly implicate whether Doe could lawfully consent to sending sexually explicit images of herself to Sanders. In contrast, the charge based on subsection (a)(2) was based on Sanders possessing a video depicting their consensual sexual activity. There was trial evidence suggesting Doe did not consent to Sanders recording and possessing those videos, based on her testimony that she did not want to view them, but knew he was recording them. Stated another way, were this court to agree with Sanders on his challenge to subsection (a)(1) based on the Fourteenth Amendment and section 18 of the Kansas Constitution Bill of Rights, that does not automatically mean his possession of the video under subsection (a)(2) falls within the same scope of constitutional protection for private, consensual sexual activity. Distinguishing these two situations may require further development of facts, which is properly the function of the trial court.

Sanders invokes the fundamental rights exception to consider his new challenge based on section 1 of the Kansas Constitution Bill of Rights, which by definition requires him to establish a fundamental right is being threatened. See *Hodes I*, 309 Kan. at 673 (The presumption of constitutionality does not apply when a statute implicates

9

fundamental interests. In such cases, "'the burden of proof is shifted from plaintiff to defendant and the ordinary presumption of validity of the statute is reversed.'").

As the State points out, other panels of this court have declined to review similar claims for the first time on appeal based on the rationale in *Hodes I* because of the necessary factual inquiry that must be conducted when reviewing an as applied challenge. See *State v. Hanks*, No. 125,270, 2024 WL 136655, at *12-13 (Kan. App. 2024) (unpublished opinion) (declining to address as applied constitutional challenge to rape, sodomy, and aggravated indecent liberties statutes as violation of "right to choose one's own sexual partner"), *rev. denied* 318 Kan. 1088 (2024); *State v. Davis*, No. 124,980, 2023 WL 5811485, at *3 (Kan. App. 2023) (unpublished opinion) (indecent liberties), *rev. denied* 319 Kan. __ (September 6, 2024). Like these prior panels, we exercise our discretion to decline Sanders' invitation to address the merits of his unpreserved challenge based on section 1 of the Kansas Constitution Bill of Rights and *Hodes I*. And the same rationale applies to decline reviewing an unpreserved challenge to K.S.A. 21-5510(a)(2) based on the Fourteenth Amendment and section 18 of the Kansas Constitution Bill of Rights.

In any event, because the record shows Sanders preserved a challenge to K.S.A. 21-5510(a)(1) based on the Fourteenth Amendment and section 18 of the Kansas Constitution Bill of Rights, we will proceed to the merits of that claim.

B. *The Fourteenth Amendment does not protect a broadly defined fundamental right to engage in all forms of private, consensual sexual conduct.*

Sanders argues K.S.A. 21-5510 is unconstitutional as applied to him because it criminalizes "private consensual sexual conduct," in the form of "exchanging sexual imagery" with someone above the legal age of consent. The legal foundation for this argument stems from the 2003 decision in *Lawrence v. Texas*, 539 U.S. 558, 560, 123 S.

10

Ct. 2472, 156 L. Ed. 2d 508 (2003), in which the United States Supreme Court held a Texas law criminalizing homosexual sodomy was unconstitutional. But to fully understand Sanders' right to privacy argument, we must look back even further at how the Supreme Court caselaw in this area has developed.

To begin, neither the United States Constitution nor the Kansas Constitution has specific language guaranteeing a "right to privacy." The Due Process Clause of the Fourteenth Amendment states: "[N]or shall any State deprive any person of life, liberty, or property, without due process of law." The counterpart in section 18 of the Kansas Constitution Bill of Rights states: "All persons, for injuries suffered in person, reputation or property, shall have remedy by due course of law, and justice administered without delay." Kansas courts have historically analyzed section 18 of the Kansas Constitution Bill of Rights as coextensive with its federal counterpart. See *State v. Boysaw*, 309 Kan. 526, 537-38, 439 P.3d 909 (2019).

But the United States Supreme Court has recognized the explicit rights guaranteed in the federal Bill of Rights "have penumbras, formed by emanations from those guarantees that help give them life and substance" and which "create zones of privacy." *Griswold v. Connecticut*, 381 U.S. 479, 484, 85 S. Ct. 1678, 14 L. Ed. 2d 510 (1965). In *Griswold*, the Court struck down Connecticut's ban on use of contraceptives by married persons, holding the laws unconstitutionally intruded upon the right of marital privacy, part of the penumbras of the Bill of Rights.

The Court later extended the right discussed in *Griswold* to include unmarried persons, striking down laws restricting the distribution of contraceptives to unmarried individuals on Equal Protection grounds. See *Eisenstadt v. Baird*, 405 U.S. 438, 448-54, 92 S. Ct. 1029, 31 L. Ed. 2d 349 (1972). The *Eisenstadt* Court explained: "If the right of privacy means anything, it is the right of the *individual*, married or single, to be free from unwarranted governmental intrusion into matters so fundamentally affecting a person as

11

the decision whether to bear or beget a child." (Emphasis added.) 405 U.S. at 453. A few years later, the Court considered a New York law prohibiting sale or distribution of contraceptives to persons under the 16 years old in *Carey v. Population Services International*, 431 U.S. 678, 97 S. Ct. 2010, 52 L. Ed. 2d 675 (1977). There, four justices agreed "the right to privacy in connection with decisions affecting procreation extends to minors as well as to adults." 431 U.S. at 693.

*Griswold* and *Eisenstadt* led to the Court's decision in *Roe v. Wade*, 410 U.S. 113, 152-53, 93 S. Ct. 705, 35 L. Ed. 2d 147 (1973), *overruled by Dobbs v. Jackson Women's Health Organization*, 597 U.S. 215, 142 S. Ct. 2228, 213 L. Ed. 2d 545 (2022), which held the right to privacy only included "'fundamental'" rights, including a woman's decision whether to terminate a pregnancy. Although *Dobbs* overruled *Roe*, the majority opinion did so by repeatedly distinguishing the right to abortion recognized in *Roe* as uniquely involving termination of a "'potential life'" and reiterating that overruling *Roe* "should [not] be understood to cast doubt on precedents that do not concern abortion." *Dobbs*, 597 U.S. at 290, 295.

Returning to *Lawrence*, it involved a constitutional challenge to a sodomy statute. The key difference is that the Texas statute at issue applied only to persons of the same sex. The *Lawrence* Court stated that the cases involved "whether the petitioners were free as adults to engage in the private conduct in the exercise of their liberty under the Due Process Clause of the Fourteenth Amendment to the Constitution." 539 U.S. at 564. And ultimately, the *Lawrence* Court concluded the Texas law was unconstitutional because it furthered no legitimate state interest to justify intruding into an individual's intimate personal and private life. The Court explained its ruling as follows:

> "The present case does not involve minors. It does not involve persons who might be injured or coerced or who are situated in relationships where consent might not easily be refused. It does not involve public conduct or prostitution. It does not involve

12

whether the government must give formal recognition to any relationship that homosexual persons seek to enter. The case does involve two adults who, with full and mutual consent from each other, engaged in sexual practices common to a homosexual lifestyle. The petitioners are entitled to respect for their private lives. The State cannot demean their existence or control their destiny by making their private sexual conduct a crime. Their right to liberty under the Due Process Clause gives them the full right to engage in their conduct without intervention of the government." 539 U.S. at 578.

Sanders acknowledges that *Lawrence* explicitly held the case "does not involve minors," but nonetheless seeks to apply its holdings to the Kansas sexual exploitation of a child statute. But as the State points out, numerous federal courts have rejected similar attempts to apply *Lawrence* in cases like this. For instance, in *United States v. Bach*, 400 F.3d 622, 629 (8th Cir. 2005), the 41-year-old defendant was prosecuted for pressuring a 16-year-old boy to pose for nude photos and then transmitted those photos over the internet. Like Sanders, Bach sought to challenge his convictions based on the liberty interest recognized in *Lawrence*, but the Eighth Circuit disagreed that *Lawrence* applied since the conduct involved a minor who was coerced into engaging in the conduct at issue. *Bach*, 400 F.3d at 629.

The Eight Circuit adhered to this reasoning in *United States v. Rouse*, 936 F.3d 849, 852 (8th Cir. 2019), which is more factually analogous. Rouse engaged in a sexual relationship with a 16-year-old girl in Nebraska, which also sets the age of consent at 16 years of age. Rouse recorded some of their sexual activity with the victim's consent and later transmitted those videos to the victim. The victim also sent sexually explicit photos to Rouse. Rouse conditionally pleaded guilty to distribution of child pornography under 18 U.S.C. § 2252A(a)(2), reserving the right to appeal the constitutionality of the statute. But like in *Bach*, the appellate court rejected his argument that *Lawrence* created "a right to engage in lawful sexual conduct with a minor and record it on video for personal use." 936 F.3d at 852.

13

Lastly, the State references *State v. Senters*, 270 Neb. 19, 699 N.W.2d 810 (2005), which also rejected a substantive due process challenge based on *Lawrence* in a case involving a defendant convicted of making child pornography under a Nebraska law. Like the Eighth Circuit, the Nebraska Supreme Court believed *Lawrence* was not intended to apply to conduct involving children. 270 Neb. at 25. The *Senters* court added that "the State, in regulating child pornography, remains free to define children as persons under the age of 18, even if the age of consent is lower, as long as the law passes traditional rational basis review." 270 Neb. at 25. And under that standard of review, the *Senters* court concluded the State has a legitimate reason to ban the creation of child pornography because it "is often associated with child abuse and exploitation, resulting in physical and psychological harm to the child," and due to the potential for "reputational harm." 270 Neb. at 26-27 ("It is reasonable to conclude that persons 16 and 17 years old, although old enough to consent to sexual relations, may not fully appreciate that today's recording of a private, intimate moment may be the Internet's biggest hit next week."). We find the Nebraska court's analysis persuasive and we adopt it here.

Sanders recognizes this caselaw but asserts the *Lawrence* court possibly used "'minor'" to mean someone under the age of consent. He also contends the "disclaimer is simply intended to dispel the notion that nonconsensual or questionably-consensual private sexual conduct is constitutionally protected." As support, Sanders cites *Esquivel-Quintana v. Sessions*, 581 U.S. 385, 398, 137 S. Ct. 1562, 198 L. Ed. 2d 22 (2017), in which the Supreme Court interpreted the federal sexual abuse of a minor statute as requiring the age of the victim to be less than 16. He also references *In re J.M.*, 276 Ga. 88, 90, 575 S.E.2d 441 (2003), which held the constitutional right of privacy in the Georgia constitution prohibited the State from criminalizing "the private, non-commercial, consensual sexual acts of two persons legally capable of consenting to those acts."

14

Sanders also points out that the Kansas Supreme Court applied *Lawrence* in *State v. Limon*, 280 Kan. 275, 287, 122 P.3d 22 (2005), which involved an equal protection challenge to the unlawful voluntary sexual relations statute because it punished members of different sexes less harshly than members of the same sex engaging in the same conduct. Limon, who was 18, was convicted of criminal sodomy against 15-year-old M.A.R. But as the State correctly notes, *Limon* did not involve a substantive due process claim like the one Sanders is raising. But more to the point, Sanders' reference to these cases inadvertently reveals why his argument is not persuasive.

First, Sanders repeatedly equates the age of consent with the age of majority, which is incorrect. Whether a person is considered a child in Kansas is statutorily different than whether one is considered of sufficient age to consent to sexual intercourse. The Kansas Legislature has the power to determine the age of majority and has said it begins at age 18. See K.S.A. 38-101. Elsewhere in the statutes, a "[m]inor child" means any unemancipated child under the age of 18. K.S.A. 38-615(d). For a minor child to have the rights of one 18 or over, the child must petition the district to confer those rights. K.S.A. 38-108; K.S.A. 38-109.

So while persons over the age of 16 can lawfully consent to sexual intercourse, the sexual exploitation of a child statute itself still refers to such persons as a "child." See K.S.A. 21-5510. Thus, Sanders' attempt to equate the ability to consent to sexual intercourse with being an "adult" fails.

Next, *Esquivel-Quintana* is of little relevance since it did not involve any constitutional claims, let alone one based on the defendant's substantive due process rights. 581 U.S. 385. While *In re J.M.* and *Limon* directly involved constitutional challenges to laws that criminalized sexual conduct involving a minor, Sanders is *not* being prosecuted for having sex with a minor. His convictions for sexual exploitation of a child relate to enticing a 16-year-old to send him sexually explicit photos and possessing

15

a video of a 16-year-old engaging in sexual activity. At no point in his brief does Sanders provide any authority recognizing this conduct as deserving of constitutional protection. In contrast, the State references several decisions which have rejected the notion that making and distributing child pornography is a constitutionally protected activity simply because the minor could lawfully consent to sexual activity. Failure to support a point with pertinent authority or failure to show why a point is sound despite a lack of supporting authority or in the face of contrary authority is like failing to brief the issue. *State v. Meggerson*, 312 Kan. 238, 246, 474 P.3d 761 (2020).

Finally, Sanders tries to seize upon language in *Obergefell v. Hodges*, 576 U.S. 644, 667, 135 S. Ct. 2584, 192 L. Ed. 2d 609 (2015), to argue that *Lawrence* "broadly protects private 'intimate association' of any kind." But as mentioned, *Lawrence* explicitly placed limits on its applicability by noting the case "does not involve minors[,] . . . persons who might be injured or coerced or who are situated in relationships where consent might not easily be refused[, or] . . . public conduct or prostitution." *Lawrence*, 539 U.S. at 578. Thus, contrary to Sanders' assertion, *Lawrence* did not recognize a broadly defined fundamental right to engage in all forms of private sexual conduct, and we reject Sanders' claim that making and distributing child pornography is a constitutionally protected activity simply because the minor could lawfully consent to sexual activity. Accordingly, we find Sanders fails to carry his burden of proving his substantive due process claim based on *Lawrence* and the Fourteenth Amendment.

C. *Sanders fails to brief his claim that a "right to privacy" is a natural right protected under section 1 of the Kansas Constitution Bill of Rights.*

Moving to Sanders' challenge based on section 1 of the Kansas Constitution Bill of Rights, he first argues that the Kansas Supreme Court has identified a "'right to privacy'" as a "'natural right'" deserving of constitutional protection. See *Hodes I*, 309 Kan. at 650 (citing *Kunz v. Allen*, 102 Kan. 883, 884, 172 P. 532 [1918]). Sanders also argues the

16

"right to self-autonomy" recognized in *Hodes I* should also include the right to engage in private, consensual sexual intimacy. These points are unpersuasive and lack adequate support.

While Sanders is correct that *Hodes I* mentioned privacy as a natural right, Sanders ignores that the *Hodes I* court explained that explicitly recognizing a constitutional right to privacy was "'not necessary'" to its decision to recognize that the Kansas Constitution protects the right to decide whether to continue a pregnancy. *Hodes I*, 309 Kan. at 650 (quoting *Preterm Cleveland v. Voinovich*, 89 Ohio App. 3d 684, 692, 627 N.E.2d 570 [1993]). Similarly, *Hodes I* said nothing about whether the right to self-autonomy includes a right to sexual privacy as Sanders asserts in his brief. The only cases cited by Sanders other than *Hodes I* on this issue are not on point because they specifically dealt with interpreting the Georgia constitutional right to privacy that has been developed through years of Georgia caselaw. See *In re J.M.*, 276 Ga. 88; *Powell v. State*, 270 Ga. 327, 329, 510 S.E.2d 18 (1998). For these reasons, we likewise find he has failed to carry his burden of proving a claim based on section 1 of the Kansas Constitution Bill of Rights.

II.      *The identical offense doctrine does not apply to Sanders' sentence.*

Sanders next argues that the district court should have sentenced him for attempted aggravated intimidation of a witness because he was found guilty of a completed aggravated intimidation of a witness based on a jury finding of attempted conduct. Stated another way, Sanders asserts the identical offense doctrine applies to his case because the elements of his crime of conviction are identical to an attempt to commit the same offense. We find his argument unpersuasive.

As Sanders notes, where two criminal offenses have the same elements but impose different penalties, a defendant convicted of either crime may be sentenced only under

the lesser penalty provision. *State v. Euler*, 314 Kan. 391, 400, 499 P.3d 448 (2021). The identical offense doctrine applies either when: (1) the two offenses each have some provisions that overlap, the overlapping provisions apply to the charged crime, and the overlapping portions of the offenses are identical except the penalty; or (2) the two offenses have entirely identical provisions except the penalty provisions. 314 Kan. at 400. According to Sanders, the former scenario is present here because he was convicted of aggravated intimidation of a witness based on an attempt to prevent Doe from reporting his crimes, which has elements that overlap with the crime of attempted aggravated intimidation of a witness.

We disagree. The identical offense doctrine does not apply because Sanders is not comparing two separate criminal offenses, but two offenses arising under a single statute with different severity levels. See *State v. Robinson*, 293 Kan. 1002, 1037, 270 P.3d 1183 (2012) (holding identical offense doctrine "applies only when two separate criminal offenses are compared"). Sanders points out the rule cited by the State was made "in the context of cases in which a lesser offense was asserted to be identical to a greater offense that criminalized the same conduct as the lesser offense *with an additional aggravating element*." He also asserts this case involves multiple statutes, particularly K.S.A. 21-5301 (defining "attempt" and prescribing lesser penalties for attempted crimes) and K.S.A. 21-5909 (defining simple and aggravated intimidation of a witness offenses and prescribing penalties).

Sanders, however, makes a critical error in presenting his identical offense doctrine claim. While he is correct that K.S.A. 21-5301(a) defines "attempt" crimes, he overlooks that the Legislature deliberately designed the intimidation of a witness statute to avoid its application by including "attempt" language in the offense's elements. See K.S.A. 21-5909(a); *State v. Mora*, 315 Kan. 537, 542, 509 P.3d 1201 (2022) (discussing different ways Legislature has addressed attempt crimes and when default definition applies); *State v. Horn*, 288 Kan. 690, Syl. ¶ 2, 206 P.3d 526 (2009) ("Where the statute

18

defining a crime does not include an attempt as a means of violating that criminal statute, an attempt to commit the crime is a separate offense which is created and defined by the provisions of [predecessor to K.S.A. 21-5301(a)].").

Moreover, the Kansas Supreme Court has held "attempting to prevent or dissuade" a victim is "not [an] alternative means of committing the crime of aggravated intimidation of a victim." *State v. Aguirre*, 296 Kan. 99, 108, 290 P.3d 612 (2012). "[T]he crime of aggravated intimidation is complete when the defendant, with the requisite intent, commits an act to intimidate the victim." 296 Kan. at 106. In other words, the attempt subsection of the aggravated intimidation of a witness statute which Sanders was convicted of is but one example of the factual circumstances that could establish the actus reus of the offense.

We conclude that the identical offense doctrine does not apply here because attempted aggravated intimidation of a witness, K.S.A. 21- 5909(a)(2)(A), is not a separate offense controlled by K.S.A. 21-5301 or subject to the reduced penalty provisions of that statute. Because the aggravated intimidation of a witness statute includes attempt language, the offense is complete even when a defendant attempts to prevent or dissuade a witness. Accordingly, we reject Sanders' invitation to apply the identical offense doctrine to his conviction for aggravated intimidation of a witness.

III.    *Because there was evidence presented to the jury regarding Sanders' age, the district court did not err in imposing lifetime postrelease supervision.*

Sanders next challenges the district court's imposition of a lifetime postrelease supervision term under K.S.A. 22-3717(d)(1)(G)(i), which requires a lifetime term if an offender was 18 or older when they committed a sexually violent crime. According to Sanders, his crime of conviction did not include his age as an element of the offense, so

19

he was convicted of a "lesser" offense that only required a 60-month postrelease supervision term.

To begin, Sanders concedes he is raising this claim for the first time on appeal, yet he asserts this court can consider it because an illegal sentence can be corrected "'at any time.'" K.S.A. 22-3504(a); *State v. Dickey*, 301 Kan. 1018, 1034, 350 P.3d 1054 (2015).

Our Supreme Court has repeatedly held that K.S.A. 22-3504(a) does not cover a claim that a sentence violates a constitutional provision. See *State v. Warrior*, 303 Kan. 1008, 1010, 368 P.3d 1111 (2016). Apparently to avoid this rule, Sanders insists he is challenging his lifetime postrelease supervision term as a statutory illegal sentence claim rather than raising a claim based on a constitutional violation under *Apprendi v. New Jersey*, 530 U.S. 466, 490, 120 S. Ct. 2348, 147 L. Ed. 2d 435 (2000). Yet, he relies heavily on *Apprendi* to argue his claim.

For example, Sanders asserts "[c]rimes are defined by their 'elements,'" and "[c]onstitutionally speaking an 'element' is any fact that must be proven to either create, or enhance, a defendant's exposure to punishment." These assertions are merely recitations of the *Apprendi* court's recognition that a "'sentence enhancement' [factor] is the functional equivalent of an element of a greater offense than the one covered by the jury's guilty verdict. Indeed, it fits squarely within the usual definition of an 'element' of the offense." *Apprendi*, 530 U.S. at 494 n.19; *State v. Bello*, 289 Kan. 191, 199, 211 P.3d 139 (2009) ("[M]erely because a state legislature places a sentence enhancing factor within the sentencing provisions of the criminal code does not mean that the factor is not an essential element of the offense.") (citing *Apprendi*, 530 U.S. at 495).

By definition, Sanders' purported "illegal sentence" claim clearly implicates *Apprendi* because he is arguing the district court increased the penalty for his crime of conviction beyond the prescribed statutory maximum based solely on judicial fact-finding

20

of his age. See *Blakely v. Washington*, 542 U.S. 296, 303-04, 124 S. Ct. 2531, 159 L. Ed. 2d 403 (2004) ("[T]he 'statutory maximum' for *Apprendi* purposes is the maximum sentence a judge may impose *solely on the basis of the facts reflected in the jury verdict or admitted by the defendant*. In other words, the relevant 'statutory maximum' is not the maximum sentence a judge may impose after finding additional facts, but the maximum [a judge] may impose *without* any additional findings. [Citations omitted.]"). Put simply, Sanders cannot disguise his argument as an illegal sentence claim to avoid adverse caselaw stemming from *Apprendi* while still relying on its holdings. His illegal sentence claim necessarily fails.

We note that the recent Supreme Court case of *State v. Nunez*, 319 Kan. 351, 354, 554 P. 3d 656 (2024)—decided while this appeal was pending— did address this issue, but not as an illegal sentence claim. There the court noted that an *Apprendi* error can be harmless if the reviewing court is convinced beyond a reasonable doubt the jury verdict would have been the same absent the error related to the omitted element, and that the omitted element was also uncontested and supported by overwhelming evidence. 319 Kan. at 356. Here, although the State never explicitly asked the jury to make a finding of Sanders' age, Detective Crystal Schell nonetheless testified at trial that Sanders provided his date of birth as March 21, 1974, upon his arrest. This meant Sanders was 43 years old when the investigation began in February 2018, and 44 years old at the time of arrest. He did not contest this evidence. Based on this evidence, the jury could reasonably have concluded beyond a reasonable doubt that Sanders was 18 or older at the time of his crimes.

IV.     *Lifetime postrelease supervision is not cruel or unusual punishment as applied to Sanders.*

Sanders also challenges his lifetime postrelease supervision term by arguing it constitutes cruel or unusual punishment in violation of section 9 of the Kansas

Constitution Bill of Rights under the specific facts of his case. As support, he asserts his conduct—sharing and possessing sexual imagery of Doe—is "decidedly less harmful than actual sexual intercourse that our legislature has not deemed fit to criminalize *at all*," and that no other states mandate an irrevocable term of lifetime supervision for similar conduct.

Appellate courts apply a bifurcated standard of review when assessing whether a sentence is cruel or unusual in violation of section 9 of the Kansas Constitution Bill of Rights. See *State v. Mossman*, 294 Kan. 901, 906, 281 P.3d 153 (2012) (citing *State v. Ortega-Cadelan*, 287 Kan. 157, 160, 194 P.3d 1195 [2008]). We review the district court's factual findings for substantial competent evidence without reweighing the evidence. The legal conclusions drawn from the factual findings are considered de novo. 294 Kan. at 906 (citing *State v. Gant*, 288 Kan. 76, 80, 201 P.3d 673 [2009]; *State v. Woolverton*, 284 Kan. 59, 70, 159 P.3d 985 [2007]).

In addition, a challenge to lifetime postrelease supervision imposed under K.S.A. 22-3717(d)(1)(G) is an indirect attack on the statute's constitutionality as applied. "[I]f there is any reasonable way to construe the statute as constitutional, courts have the duty to do so by resolving all doubts in favor of constitutionality." *Mossman*, 294 Kan. at 906-07 (citing *State v. Laturner*, 289 Kan. 727, 735, 218 P.3d 23 [2009]).

As Sanders notes, he is specifically raising an as-applied challenge based solely on section 9 of the Kansas Constitution Bill of Rights, which provides "[e]xcessive bail shall not be required, nor excessive fines imposed, nor cruel or unusual punishment inflicted." Kansas courts assess such challenges relying on the analysis set out in *Freeman*, which identified the following relevant factors for determining whether a particular sentence violates the Kansas Constitution's prohibition against cruel and unusual punishments:

"(1) The nature of the offense and the character of the offender should be examined with particular regard to the degree of danger present to society; relevant to this inquiry are the facts of the crime, the violent or nonviolent nature of the offense, the extent of culpability for the injury resulting, and the penological purposes of the prescribed punishment;

"(2) A comparison of the punishment with punishments imposed in this jurisdiction for more serious offenses, and if among them are found more serious crimes punished less severely than the offense in question the challenged penalty is to that extent suspect; and

"(3) A comparison of the penalty with punishments in other jurisdictions for the same offense." 223 Kan. at 367.

No one factor is controlling, and the court should consider each factor—but one factor may weigh so heavily in a specific case that it determines the outcome. *State v. Funk*, 301 Kan. 925, 935, 349 P.3d 1230 (2015).

A. *Freeman Factor 1: Nature of the Offense and Character of the Offender*

The first *Freeman* factor is "inherently factual, requiring examination of the facts of the crime and the particular characteristics of the defendant." *Ortega-Cadelan*, 287 Kan. at 161. Sanders argues the district court improperly considered this factor by basing its decision primarily on findings related to his character, rather than the nature of his criminal conduct that led to his convictions. Sanders makes no attempt to challenge the district court's factual findings that he "sat in a fiduciary relationship" to "groom[]" Doe and was a "predator." As a result, he has waived and abandoned those points. *Meggerson*, 312 Kan. at 246 (points raised incidentally in a brief and not argued therein are deemed waived or abandoned).

23

Sanders primarily argues the district court improperly weighed this factor in the State's favor because his level of culpability is lower than a hypothetical defendant who possessed or requested sexually explicit images of someone under the age of 16 who could not lawfully consent to a sexual relationship. He also points out that his criminal history was low, thus suggesting he is not "prone to the sort of recidivism that postrelease sentences are intended to prevent." The only case Sanders cites in direct support of his view that this factor weighs in his favor is *State v. Proctor*, No. 104,697, 2013 WL 6726286, at \*4 (Kan. App. 2013) (unpublished opinion), for the proposition that the State's "legitimate interest in the indefinite monitoring of child sex offenders . . . is not without limit."

In *Proctor*, the 19-year-old defendant pleaded guilty to several child sex crimes after he, on multiple occasions, "cajoled [a 12-year-old family friend] into having manual and oral contact with [his] penis." 2013 WL 6726286, at \*2. On appeal, this court found the first *Freeman* factor weighed in the defendant's favor based on several facts, mainly because the district court had determined the circumstances warranted imposing probation. 2013 WL 6726286, at \*4. In the panel's view, subjecting Proctor to a potential lifetime prison sentence for a felony conviction was "constitutionally irreconcilable with the district court's entirely proper determination to place Proctor on probation." 2013 WL 6726286, at \*4. The panel also noted Proctor's young age and lack of criminal history, combined with the evidence presented that Proctor himself was a victim of child sex abuse, suggested the penological purposes of lifetime postrelease supervision would not be served under the facts of the case. 2013 WL 6726286, at \*5-6.

But Sanders cannot rely on Proctor because the only relevant factor present in both cases is a lack of significant criminal history. And *Proctor* says nothing about a victim's capability to consent factoring into the court's consideration of the first *Freeman* factor because the crimes involved a 12-year-old victim. So contrary to Sanders' points, he offers nothing but conclusory assertions to challenge the district court's legal conclusion

24

that the nature of his offenses and his character weighed in his favor. See *Meggerson*, 312 Kan. at 246. As a result, the district court correctly weighed the first *Freeman* factor in the State's favor.

B. *Freeman Factor 2: Comparison of Punishments in Kansas*

When discussing the second *Freeman* factor, the district court found it "finds against the defendant" without much elaboration. After making findings for all three factors, the court explained the nature of the offense and Sanders' character—as well as "the goals of post-release supervision"—"outweigh[ed] the lack of strict proportionality with other sentences in Kansas and other jurisdictions, especially those that the sentence is not grossly disproportional." The court also said it was "adopt[ing] the other findings set forth in [*State v. Cameron*, 294 Kan. 884, 889, 281 P.3d 143 (2012); *Mossman*, 294 Kan. at 903; and *State v. Collins*, No. 105,523, 2012 WL 5519088, *3 (Kan. App. 2012) (unpublished opinion)], and the arguments set forth by the State at this point in time."

Before discussing the cases referenced in the district court's ruling, we first note the State made the following statements at the hearing potentially in relation to the second *Freeman* factor:

- "[W]hile this is a sex offense and potentially lower severity level on the grid as far [as] sex offense convictions would go, I would submit that this is still a violent offense."
- "[I]n comparing this punishment with punishments imposed in this jurisdiction for more serious offenses or even comparable offenses, I would submit again that this does not rise to the level of being unconstitutional."

Both defendants in *Cameron* and *Mossman* compared the penalty for their crimes of conviction—aggravated indecent solicitation of 12-year-old child and aggravated

indecent liberties with a 15-year-old child, respectively—to that imposed for an offender convicted of second-degree murder to discuss proportionality. The Kansas Supreme Court was unconvinced in both cases that a lifetime postrelease supervision term was so grossly disproportionate to weigh the second *Freeman* factor in either defendants' favor simply because the prison sentence for a second-degree murder conviction was longer. See *Cameron*, 294 Kan. at 893; *Mossman*, 294 Kan. at 917. This court relied on the same rationale in *Collins* to uphold the lifetime postrelease supervision term imposed for a conviction of aggravated indecent solicitation of an 11-year-old child. *Collins*, 2012 WL 5519088, at *3-4.

Here, Sanders argues only the district court's analysis of the second *Freeman* factor is "flawed" because his crimes might be less serious than "conduct that is lawful in Kansas, and, thus, carries no punishment at all." In short, Sanders asserts this factor should have weighed in his favor because "Kansas counterintuitively punishes the exchange of sexual imagery more seriously than actual sexual intercourse," which in his view is "decidedly odd and unjust" because he is being punished for conduct that "entails a [lesser] level of intimacy."

The only authority Sanders cites to support his point is a concurring opinion in *Rouse*, 936 F.3d at 852-53, in which Eighth Circuit Judge Beam wrote separately to note that "the conviction and especially the sentence of 96 months–under the particular facts of this case is unseemly and quite possibly unfair." Like Sanders, Rouse engaged in a consensual sexual relationship with a 16-year-old girl. Rouse later plead guilty to a distribution of child pornography charge for transmitting a video of one of the sexual encounters to the victim. *Rouse* is inapplicable to the current issue because it did not involve a challenge to any portion of the defendant's sentence as being cruel and unusual punishment.

26

Moreover, as the State points out, accepting Sanders' invitation to substitute the second *Freeman* factor for a more favorable comparison would be contrary to Kansas Supreme Court precedent. *State v. Rodriguez*, 305 Kan. 1139, 1144, 390 P.3d 903 (2017) (this court is duty bound to follow Kansas Supreme Court precedent). As Sanders offers no compelling argument to counter the district court's rationale for weighing the second *Freeman* factor in his favor, this court has to adopt the rationale in *Cameron* and *Mossman*. Moreover, as these courts recognized, sexual exploitation of a child—regardless of the victim's age—is still statutorily defined as a sexually violent crime. K.S.A. 22-3717(d)(5)(H). Thus, we find that the district court's factual findings support its legal conclusion that the second *Freeman* factor does not weigh in Sanders' favor.

C. Freeman *Factor 3: Comparison with Punishments in Other States*

When discussing the third and final *Freeman* factor, the district court found "there are other jurisdictions that have this same sentencing scheme," so it "weighs against the defendant as well." And as mentioned above, the court explained the first *Freeman* factor "outweigh[ed] the lack of strict proportionality with other sentences in Kansas and other jurisdictions, especially those that the sentence is not grossly disproportional" and adopted the rationale expressed in *Collins*, *Cameron*, and *Mossman*.

Like the previous factor, Sanders says the district court's analysis is flawed because Kansas mandates an irrevocable term of lifetime postrelease supervision for conduct that would not be punished similarly in other jurisdictions. Yet he mentions the Kansas Supreme Court has recognized that there is no national consensus against imposing lifetime postrelease supervision on offenders convicted of child pornography and similar offenses. See *State v. Williams*, 298 Kan. 1075, 1088-89, 319 P.3d 528 (2014) (citing *United States v. Williams*, 636 F.3d 1229 [9th Cir. 2011]) (considering categorical challenge to lifetime postrelease supervision arising under the Eighth Amendment). But

27

according to Sanders, it is significant that Kansas requires judges to impose lifetime supervision, while that decision is discretionary at the federal level.

As an example, Sanders compares two hypothetical defendants:  (1) "a pedophile [who] downloads thousands of sexually sadistic images depicting extremely young children"; and (2) a 19-year-old female "[who] requests a nude photo from her 17-year-old boyfriend." Because a sentencing judge would be compelled to impose lifetime postrelease supervision on both defendants under Kansas law—but could use "his or her common sense to distinguish the pedophile from the 19-year-old who had the misfortune of having a slightly younger boyfriend" under federal law—Sanders argues the third *Freeman* factor should weigh in his favor.

In response, the State points to this court's decision in *State v. Wieland*, No. 114,900, 2017 WL 657999, at *5-6 (Kan. App. 2017) (unpublished opinion), which rejected an as-applied challenge to a term of lifetime postrelease supervision based on section 9 of the Kansas Constitution Bill of Rights. There, we recognized that "Kansas appears to impose the most severe postrelease supervision for attempted possession of child pornography. . . . [But] that doesn't mean the state with the harshest punishment necessarily has committed a constitutional violation. Or here, since that appears to be Kansas, the punishment runs afoul of the third *Freeman* factor." 2017 WL 657999, at *5. This court added:

> "The first and second factors are far more significant in determining whether the Kansas Constitution has been violated, since they deal with the circumstances of the case and the intent of the Kansas Legislature in fixing criminal penalties. How Kansas fares against other states and their legislative approaches to sentencing criminals presents a less compelling criterion for establishing a violation of § 9." 2017 WL 657999, at *5.

Although this court is not bound by decisions from other panels, the State correctly points out that *Cameron* and *Mossman* expressed similar rationales for

28

concluding lifetime postrelease supervision sentences for offenders convicted of statutorily defined sexually violent crimes are not disproportionate to the punishments imposed in other jurisdictions for similar offenses. *Cameron*, 294 Kan. at 894-95 (citing *Mossman*, 294 Kan. 901, Syl. ¶ 5). Because Sanders offers no compelling reason to differentiate his case, this court finds that the district court correctly weighed the third *Freeman* factor in the State's favor.

In sum, contrary to Sanders' points, the district court did not err in weighing the three *Freeman* factors in this case and concluding that lifetime postrelease supervision was not cruel and unusual punishment in violation of the Kansas Constitution.

V.      *The district court did not err in imposing Children's Advocacy Center assessment fees for each crime.*

Sanders next argues the district court erred in imposing four Children's Advocacy Center (CAC) fees under K.S.A. 20-370(a), rather than a single $400 fee.

Resolving this issue requires statutory interpretation, which presents a question of law subject to unlimited review. *State v. Alvarez*, 309 Kan. 203, 205, 432 P.3d 1015 (2019). The most fundamental rule of statutory construction is that the intent of the Legislature governs if that intent can be established. *State v. Keys*, 315 Kan. 690, 698, 510 P.3d 706 (2022). This court must first attempt to determine legislative intent though the statutory language enacted, giving common words their ordinary meanings 315 Kan. at 698. Unless the statute is ambiguous, courts need not resort to canons of statutory construction or legislative history to determine the legislative intent. *Betts*, 316 Kan. at 198.

The relevant statute is K.S.A. 20-370(a), which provides "[o]n and after July 1, 2013, any defendant convicted of a crime under chapter 21 of the Kansas Statutes

29

Annotated, and amendments thereto, in which a minor is a victim, shall pay an assessment fee in the amount of $400 to the clerk of the district court." Here, the district court imposed a $1,600 CAC fee, so presumably the amount reflects a $400 fee for each of Sanders' four convictions involving a minor victim.

The only Kansas appellate court that appears to have interpreted the statute thus far is *State v. McDuffie*, No. 113,987, 2017 WL 2617648 (Kan. App. 2017) (unpublished opinion). There, this court determined the language of the statute could be read two ways: (1) as creating a "one-to-one ratio, where defendants convicted of one crime against a minor are required to pay one fee, but defendants convicted of multiple crimes against minors are required to pay the number of fees equal to the crimes committed against minors"; or (2) "as requiring a defendant convicted of any unspecified number of crimes against minors to pay just one assessment fee." 2017 WL 2617648, at *19. Thus, the panel turned to legislative history to resolve the ambiguity and concluded the Legislature "intended to create a one-to-one crime-to-fee ratio requiring defendants to pay a CACF assessment fee for each crime they are convicted of committing against a minor." 2017 WL 2617648, at *19.

Both Sanders and the *McDuffie* panel rest their arguments on the words "a" crime and "an" assessment, focusing on the use of indefinite articles. Although we reach the same ultimate conclusion, we focus on the definition of the words used. After all, the first rule of statutory interpretation requires us to first attempt to ascertain legislative intent through the statutory language enacted, giving common words their ordinary meanings. *Betts*, 316 Kan. at 198.

The issue of whether fees are assessed per charge, per crime, per case or per traffic citation is an issue upon which the Legislature has been consistent and clear. So how are those words defined and how have they been used in similar statutes?

A crime is defined in Kansas statutes as "an act or omission defined by law and for which, upon conviction, a sentence of death, imprisonment or fine, or both imprisonment and fine, is authorized or, in the case of a traffic infraction or a cigarette or tobacco infraction, a fine is authorized." K.S.A. 21-5102. Likewise, Black's Law Dictionary defines a "crime" as a singular act or "[a]n act that the law makes punishable." Black's Law Dictionary 466 (12th ed. 2024).

The term "charge" is not specifically defined by statute, but it is defined as it relates to the definition of a complaint, information, or indictment as "a plain and concise written statement of the essential facts constituting the crime charged." K.S.A. 22-3201. Black's Law Dictionary defines a charge as "[a] formal accusation of an offense as a preliminary step to prosecution." Black's Law Dictionary 291 (12th ed. 2024).

The term "count" is also not defined by statute, but in common legal usage it means "[t]he part of a charging instrument alleging that the suspect has committed a distinct offense." Black's Law Dictionary 441 (12th ed. 2024). And finally, an "offense" is defined as "[a] violation of the law, a crime." Black's Law Dictionary 1296 (12th ed. 2024).

"The terms 'crime,' 'offense,' and 'criminal offense' are all said to be synonymous, and ordinarily used interchangeably. " 22 C.J.S., Criminal Law § 3. So the terms crime, charge, count, and offense refer to a singular event.

On the other hand, the term "case" refers to a civil or criminal action or proceeding. Black's Law Dictionary 266 (12th ed. 2024). When we refer to a case, we refer to a singular court action which may contain multiple charges or crimes.

31

So we turn to other statutes in which these terms are used as applied to the assessment of fees.

- The best example of similar language is contained in K.S.A. 8-2110(c).

"[W]hen the district or municipal court notifies the division of vehicles of a failure to comply with a traffic citation pursuant to subsection (b), the court shall assess a reinstatement fee of $100 *for each charge* on which the person failed to make satisfaction regardless of the disposition of *the charge* for which such citation was originally issued and regardless of any application for restricted driving privileges." (Emphasis added.)

At least since 1985, K.S.A. 8-2110(c) has provided that driver's license reinstatement fees were assessed per charge when a driver failed to comply with a charge contained in a traffic citation (even though the amount steadily increased). See K.S.A. 1985 Supp. 8-2110(c).

But effective January 1, 2025, the statute has been amended to

"[W]hen the district or municipal court notifies the division of vehicles of a failure to comply with a traffic citation pursuant to subsection (b), the court shall assess a reinstatement fee of $100." L. 2024, ch. 101, § 2 (S.B. 500).

The Legislative Summary for S.B. 500 (2024) states:

"The bill limits reinstatement fees assessed under continuing law following failure to comply to a single fee of $100, replacing the requirement that imposes a separate $100 reinstatement fee for each charge associated with the citation with which the individual did not comply, regardless of the disposition of the charge."

The use of the term "traffic citation" in the newly adopted statute is significant. A traffic citation is a charging document that lists the offenses that are being charged.

32

K.S.A. 8-2106(b). So failure to comply with a traffic citation would include all the charges contained in that citation. It is the failure to comply with the citation (not the individual charges) which results in the assessment of a fee in the amended provision. The language is clear and denotes a change in the language of the statute.

- Under K.S.A. 28-172a, regarding docket fees:

"(c) *If a conviction is on more than one count*, the docket fee shall be the highest one applicable to any one of the counts. The prosecuting witness or defendant, if assessed the costs, *shall pay only one fee*. Multiple defendants shall each pay one fee." (Emphasis added.)

- Under K.S.A. 2023 Supp. 32-1049a, regarding failure to comply with a wildlife and parks citation:

"(d) Except as provided in subsection (e), when the district court notifies the department of a failure to comply with a wildlife and parks citation *or failure to comply with a sentence of the district court imposed on violation of a wildlife and parks law or rule and regulation,* the court shall assess a reinstatement fee of $50 *for each charge or sentence* on which the person failed to make satisfaction, regardless of the disposition of the charge for which such citation was originally issued." (Emphasis added.)

- Under K.S.A 28-176(a):

"The court shall order any person convicted . . . of a misdemeanor or felony contained in chapters 21, 41 or 65 of the Kansas Statutes Annotated, and amendments thereto, . . . to pay a separate court cost of $400 *for every individual offense* if forensic science or laboratory services, forensic computer examination services or forensic audio and video examination services are provided, in connection with the investigation." (Emphasis added.)

See *State v. Goeller*, 276 Kan. 578, 584, 77 P.3d 1272, 1276 (2003), overruled on other grounds by *State v. Dickey*, 301 Kan. 1018, 350 P.3d 1054 (2015) ("The phrase 'for each offense' is clear; 'each offense' means each count on which Goeller was convicted. It matters not that multiple offenses were charged in one case.").

Keeping this definitional framework in mind, the statute at issue here, K.S.A. 20-370, reads as follows:

> "(a) On and after July 1, 2013, any defendant *convicted of a crime* under chapter 21 of the Kansas Statutes Annotated, and amendments thereto, in which a minor is a victim, shall pay an assessment fee in the amount of $400 to the clerk of the district court." (Emphasis added.)

The statute specifies "a crime," which is a singular event, as is "a charge." It does not use the term per case or per complaint or per traffic citation. As a result, we hold that K.S.A. 20-370(a) requires a defendant convicted of a crime against a minor victim to pay an assessment fee for each crime committed against a minor. Thus, the district court did not err in imposing an assessment fee for each of the four crimes Sanders committed against Doe.

VI.     *The parties agree that the district court erred in imposing a higher witness mileage fee after sentencing.*

For his final issue, Sanders argues the district court erred when it entered a higher witness mileage fee on the journal entry of judgment than the amount assessed at sentencing. He seeks a nunc pro tunc order to correct the journal entry, which this court can address for the first time on appeal. See *State v. Edwards*, 309 Kan. 830, 835, 440 P.3d 557 (2019) ("[A]ny journal entry variance from a judge's oral pronouncement during sentencing is a clerical error that may be corrected at any time."). The State concedes that

34

the journal entry is incorrect and that the appropriate remedy is to remand with directions to correct the journal entry. We agree and so order.

Affirmed in part, vacated in part, and remanded with directions.